## CITY OF RANCHO PALOS VERDES ET AL. *v.* ABRAMS

No. 03–1601.   Argued January 19, 2005—Decided March 22, 2005

114

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, in which O'CONNOR, SOUTER, and GINSBURG, JJ., joined, *post*, p. 127. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 129.

*Jeffrey A. Lamken* argued the cause for petitioners. With him on the briefs were *T. Peter Pierce, Gregory M. Kunert,* and *Nicholas P. Miller.*

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Clement, Assistant Attorney General Keisler, Deputy Solicitor General Hungar,* and *Thomas M. Bondy.*

*Seth P. Waxman* argued the cause for respondent. With him on the brief were *William T. Lake, Jonathan J. Frankel, Paul R. Q. Wolfson, Brian W. Murray, Wilkie Cheong, Christopher D. Imlay,* and *David J. Kaufman.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Alabama et al. by *Troy King,* Attorney General of Alabama, and *Kevin C. Newsom,* Solicitor General, and by the Attorneys General for their respec-

Justice Scalia delivered the opinion of the Court.

We decide in this case whether an individual may enforce the limitations on local zoning authority set forth in § 332(c)(7) of the Communications Act of 1934, 47 U. S. C. § 332(c)(7), through an action under Rev. Stat. § 1979, 42 U. S. C. § 1983.

I

Congress enacted the Telecommunications Act of 1996 (TCA), 110 Stat. 56, to promote competition and higher quality in American telecommunications services and to "encourage the rapid deployment of new telecommunications technologies." *Ibid.* One of the means by which it sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers. To this end, the TCA amended the Communications Act of 1934, 48 Stat. 1064, to include § 332(c)(7), which imposes specific limitations on the traditional authority of state and local governments to regulate the location, construction, and modification of such facilities, 110 Stat. 151, codified at 47 U. S. C.

tive jurisdictions as follows: *Gregg D. Renkes* of Alaska, *M. Jane Brady* of Delaware, *Douglas B. Moylan* of Guam, *Mark J. Bennett* of Hawaii, *Lisa Madigan* of Illinois, *Steve Carter* of Indiana, *Tom Reilly* of Massachusetts, *Mike McGrath* of Montana, *Jeremiah W. (Jay) Nixon* of Missouri, *Brian Sandoval* of Nevada, *Jim Petro* of Ohio, *Hardy Myers* of Oregon, *Lawrence E. Long* of South Dakota, *Greg Abbott* of Texas, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, and *Jerry W. Kilgore* of Virginia; for Local Governments et al. by *Roy T. Englert, Jr., Max Huffman, James N. Horwood,* and *Peter J. Hopkins;* and for the National League of Cities et al. by *Richard Ruda, James I. Crowley, Robert A. Long,* and *Heidi C. Doerhoff.*

Briefs of *amici curiae* urging affirmance were filed for the American Mobile Telecommunications Association by *Russell D. Lukas;* for the Cellular Telecommunications & Internet Association by *Andrew G. McBride, Joshua S. Turner,* and *Michael Altschul;* for the Lawyers' Committee for Civil Rights Under Law et al. by *Reginald D. Steer* and *Michael L. Foreman;* for Public Citizen, Inc., by *Scott L. Nelson;* and for James A. Kay, Jr., by *Barry Richard.*

§ 332(c)(7). Under this provision, local governments may not · "unreasonably discriminate among providers of functionally equivalent services," § 332(c)(7)(B)(i)(I), take actions that "prohibit or have the effect of prohibiting the provision of personal wireless services," § 332(c)(7)(B)(i)(II), or limit the placement of wireless facilities "on the basis of the environmental effects of radio frequency emissions," § 332(c)(7)(B)(iv). They must act on requests for authorization to locate wireless facilities "within a reasonable period of time," § 332(c)(7)(B)(ii), and each decision denying such a request must "be in writing and supported by substantial evidence contained in a written record," § 332(c)(7)(B)(iii). Lastly, § 332(c)(7)(B)(v), which is central to the present case, provides as follows:

> "Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction."

Respondent Mark Abrams owns a home in a low-density, residential neighborhood in the city of Rancho Palos Verdes, California (City). His property is located at a high elevation, near the peak of the Rancho Palos Verdes Peninsula. *Rancho Palos Verdes* v. *Abrams*, 101 Cal. App. 4th 367, 371, 124 Cal. Rptr. 2d 80, 82 (2002). The record reflects that the location is both scenic and, because of its high elevation, ideal for radio transmissions. *Id.*, at 371–372, 124 Cal. Rptr. 2d, at 82–83.

In 1989, respondent obtained a permit from the City to construct a 52.5-foot antenna on his property for amateur use.[1] He installed the antenna shortly thereafter, and in the

---

[1] The City's approval specified a maximum height of 40 feet, but, because of an administrative error, the permit itself authorized respondent to construct a tower 12.5 feet taller. 354 F. 3d 1094, 1095 (CA9 2004).

years that followed placed several smaller, tripod antennas on the property without prior permission from the City. He used the antennas both for noncommercial purposes (to provide an amateur radio service and to relay signals from other amateur radio operators) and for commercial purposes (to provide customers two-way radio communications from portable and mobile transceivers, and to repeat the signals of customers so as to enable greater range of transmission). *Ibid.*

In 1998, respondent sought permission to construct a second antenna tower. In the course of investigating that application, the City learned that respondent was using his antennas to provide a commercial service, in violation of a City ordinance requiring a "conditional-use permit" from the City Planning Commission (Commission) for commercial antenna use. See Commission Resolution No. 2000–12 ("A Resolution of the Planning Commission of the City of Rancho Palos Verdes Denying With Prejudice Conditional Use Permit No. 207 for the Proposed Commercial Use of Existing Antennae on an Existing Antenna Support Structure, Located at 44 Oceanaire Drive in the *Del Cerro* Neighborhood"), App. to Pet. for Cert. 54a. On suit by the City, Los Angeles County Superior Court enjoined respondent from using the antennas for a commercial purpose. *Rancho Palos Verdes, supra,* at 373, 124 Cal. Rptr. 2d, at 84; App. to Pet. for Cert. 35a.

Two weeks later, in July 1999, respondent applied to the Commission for the requisite conditional-use permit. The application drew strong opposition from several of respondent's neighbors. The Commission conducted two hearings and accepted written evidence, after which it denied the application. *Id.,* at 54a–63a. The Commission explained that granting respondent permission to operate commercially "would perpetuate . . . adverse visual impacts" from respondent's existing antennas and establish precedent for similar projects in residential areas in the future. *Id.,* at 57a. The

Commission also concluded that denial of respondent's application was consistent with 47 U. S. C. § 332(c)(7), making specific findings that its action complied with each of that provision's requirements. App. to Pet. for Cert. 61a–62a. The city council denied respondent's appeal. *Id.*, at 52a. See generally No. CV00–09071–SVW (RNBx) (CD Cal., Jan. 9, 2002), App. to Pet. for Cert. 22a–23a.

On August 24, 2000, respondent filed this action against the City in the District Court for the Central District of California, alleging, as relevant, that denial of the use permit violated the limitations placed on the City's zoning authority by § 332(c)(7). In particular, respondent charged that the City's action discriminated against the mobile relay services he sought to provide, § 332(c)(7)(B)(i)(I), effectively prohibited the provision of mobile relay services, § 332(c)(7)(B)(i)(II), and was not supported by substantial evidence in the record, § 332(c)(7)(B)(iii). App. to Pet. for Cert. 17a. Respondent sought injunctive relief under § 332(c)(7)(B)(v), and money damages and attorney's fees under 42 U. S. C. §§ 1983 and 1988. Plaintiff/Petitioner's Brief Re: Remedies and Damages, Case No. 00–09071–SVW (RNBx) (CD Cal., Feb. 25, 2002), App. to Reply Brief for Petitioners 2a–7a.

Notwithstanding § 332(c)(7)(B)(v)'s direction that courts "hear and decide" actions "on an expedited basis," the District Court did not act on respondent's complaint until January 9, 2002, 16 months after filing; it concluded that the City's denial of a conditional-use permit was not supported by substantial evidence. App. to Pet. for Cert. 23a–26a. The court explained that the City could not rest its denial on esthetic concerns, since the antennas in question were already in existence and would remain in place whatever the disposition of the permit application. *Id.*, at 23a–24a. Nor, the court said, could the City reasonably base its decision on the fear of setting precedent for the location of commercial antennas in residential areas, since adverse impacts from

new structures would always be a basis for permit denial. *Id.*, at 25a. In light of the paucity of support for the City's action, the court concluded that denial of the permit was "an act of spite by the community." *Id.*, at 24a. In an order issued two months later, the District Court held that § 332(c)(7)(B)(v) provided the exclusive remedy for the City's actions. Judgment of Injunction, No. CV00–09071–SVW (RNBx) (CD Cal., Mar. 18, 2002), App. to Pet. for Cert. 14a. Accordingly, it ordered the City to grant respondent's application for a conditional-use permit, but refused respondent's request for damages under § 1983. Respondent appealed.

The Court of Appeals for the Ninth Circuit reversed on the latter point, and remanded for determination of money damages and attorney's fees. 354 F. 3d 1094, 1101 (2004). We granted certiorari. 542 U. S. 965 (2004).

## II

## A

Title 42 U. S. C. § 1983 provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

In *Maine* v. *Thiboutot*, 448 U. S. 1 (1980), we held that this section "means what it says" and authorizes suits to enforce individual rights under federal statutes as well as the Constitution. *Id.*, at 4.

Our subsequent cases have made clear, however, that § 1983 does not provide an avenue for relief every time a state actor violates a federal law. As a threshold matter, the text of § 1983 permits the enforcement of *"rights,* not the

broader or vaguer 'benefits' or 'interests.'" *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 283 (2002) (emphasis in original). Accordingly, to sustain a § 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs. See *id.*, at 285.

Even after this showing, "there is only a rebuttable presumption that the right is enforceable under § 1983." *Blessing* v. *Freestone*, 520 U. S. 329, 341 (1997). The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right. See *ibid.; Smith* v. *Robinson*, 468 U. S. 992, 1012 (1984). Our cases have explained that evidence of such congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing, supra,* at 341.[2] See also *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 19–20 (1981). "The crucial consideration is what Congress intended." *Smith, supra,* at 1012.

## B

The City conceded below, and neither the City nor the Government as *amicus* disputes here, that § 332(c)(7) creates individually enforceable rights; we assume, *arguendo*, that this is so. The critical question, then, is whether Congress

---

[2] This does not contravene the canon against implied repeal, see *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936), because we have held that canon inapplicable to a statute that creates no rights but merely provides a civil cause of action to remedy "some otherwise defined federal right," *Great American Fed. Sav. & Loan Assn.* v. *Novotny*, 442 U. S. 366, 376 (1979) (dealing with a provision related to § 1983, 42 U. S. C. § 1985(3)). In such a case, "we are not faced . . . with a question of implied repeal," but with whether the rights created by a later statute "may be asserted within the *remedial* framework" of the earlier one. *Great American Fed. Sav. & Loan Assn., supra,* at 376–377.

meant the judicial remedy expressly authorized by § 332(c)(7) to coexist with an alternative remedy available in a § 1983 action. We conclude not.

The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983. As we have said in a different setting, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander* v. *Sandoval*, 532 U. S. 275, 290 (2001). Thus, the existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not.

We have found § 1983 unavailable to remedy violations of federal statutory rights in two cases: *Sea Clammers* and *Smith.* Both of those decisions rested upon the existence of more restrictive remedies provided in the violated statute itself. See *Smith, supra,* at 1011–1012 (recognizing a § 1983 action "would . . . render superfluous most of the detailed procedural protections outlined in the statute"); *Sea Clammers, supra,* at 20 ("[W]hen a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983" (internal quotation marks omitted)). Moreover, in *all* of the cases in which we have held that § 1983 *is* available for violation of a federal statute, we have emphasized that the statute at issue, in contrast to those in *Sea Clammers* and *Smith, did not* provide a private judicial remedy (or, in most of the cases, even a private administrative remedy) for the rights violated. See *Blessing, supra,* at 348 ("Unlike the federal programs at issue in *[Sea Clammers* and *Smith]*, Title IV–D contains no private remedy— either judicial or administrative—through which aggrieved persons can seek redress"); *Livadas* v. *Bradshaw,* 512 U. S.

107, 133–134 (1994) (there was a "complete absence of provision for relief from governmental interference" in the statute); *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 108–109 (1989) ("There is . . . no comprehensive enforcement scheme for preventing state interference with federally protected labor rights that would foreclose the § 1983 remedy"); *Wilder* v. *Virginia Hospital Assn.*, 496 U. S. 498, 521 (1990) ("The Medicaid Act contains no . . . provision for private judicial or administrative enforcement" comparable to those in *Sea Clammers* and *Smith*); *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 427 (1987) ("In both *Sea Clammers* and *Smith* . . . , the statutes at issue themselves provided for private judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy. There is nothing of that kind found in the . . . Housing Act").

The Government as *amicus*, joined by the City, urges us to hold that the availability of a private judicial remedy is not merely indicative of, but conclusively establishes, a congressional intent to preclude § 1983 relief. Brief for United States as *Amicus Curiae* 17; Brief for Petitioners 35. We decline to do so. The ordinary inference that the remedy provided in the statute is exclusive can surely be overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983.

There is, however, no such indication in the TCA, which adds no remedies to those available under § 1983, and limits relief in ways that § 1983 does not. Judicial review of zoning decisions under § 332(c)(7)(B)(v) must be sought within 30 days after the governmental entity has taken "final action," and, once the action is filed, the court must "hear and decide" it "on an expedited basis." § 332(c)(7)(B)(v). The remedies available, moreover, perhaps do not include compensatory damages (the lower courts are seemingly in disagreement on

this point[3]), and certainly do not include attorney's fees and costs.[4] A § 1983 action, by contrast, can be brought much later than 30 days after the final action,[5] and need not be heard and decided on an expedited basis. And the successful plaintiff may recover not only damages but reasonable attorney's fees and costs under 42 U. S. C. § 1988. *Thibotout*, 448 U. S., at 9. Liability for attorney's fees would have a particularly severe impact in the § 332(c)(7) context, making local governments liable for the (often substantial) legal expenses of large commercial interests for the misapplication of a complex and novel statutory scheme. See *Nextel Partners Inc.* v. *Kingston Township*, 286 F. 3d 687, 695 (CA3

---

[3] Compare *Primeco Personal Communications, Ltd. Partnership* v. *Mequon*, 352 F. 3d 1147, 1152–1153 (CA7 2003) (damages are presumptively available), with *Omnipoint Communications MB Operations, LLC* v. *Lincoln*, 107 F. Supp. 2d 108, 120–121 (Mass. 2000) ("[T]he majority of district courts . . . have held that the appropriate remedy for a violation of the TCA is a mandatory injunction").

[4] Absent express provision to the contrary, litigants must bear their own costs. *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 249–250 (1975). The Communications Act of 1934 authorizes the award of attorney's fees in a number of provisions, but not in § 332(c)(7)(B)(v). See, e. g., 47 U. S. C. §§ 206, 325(e)(10), 551(f)(2)(C), 605(e)(3)(B)(iii).

[5] The statute of limitations for a § 1983 claim is generally the applicable state-law period for personal-injury torts. *Wilson* v. *Garcia*, 471 U. S. 261, 275, 276 (1985); see also *Owens* v. *Okure*, 488 U. S. 235, 240–241 (1989). On this basis, the applicable limitations period for respondent's § 1983 action would presumably be one year. See *Silva* v. *Crain*, 169 F. 3d 608, 610 (CA9 1999) (citing Cal. Civ. Proc. Code Ann. § 340(3) (West 1982)). It may be, however, that this limitations period does not apply to respondent's § 1983 claim. In 1990, Congress enacted 28 U. S. C. § 1658(a) (2000 ed., Supp. II), which provides a 4-year, catchall limitations period applicable to "civil action[s] arising under an Act of Congress enacted after" December 1, 1990. In *Jones* v. *R. R. Donnelley & Sons Co.*, 541 U. S. 369 (2004), we held that this 4-year limitations period applies to all claims "made possible by a post-1990 [congressional] enactment." *Id.*, at 382. Since the claim here rests upon violation of the post-1990 TCA, § 1658 would seem to apply.

2002) (Alito, J.) ("TCA plaintiffs are often large corporations or affiliated entities, whereas TCA defendants are often small, rural municipalities"); *Primeco Personal Communications, Ltd. Partnership* v. *Mequon,* 352 F. 3d 1147, 1152 (CA7 2003) (Posner, J.) (similar).

Respondent's only response to the attorney's-fees point is that it is a "policy argumen[t]," properly left to Congress. Brief for Respondent 35–36. That response assumes, however, that Congress's refusal to attach attorney's fees to the remedy that it created in the TCA does not *itself* represent a congressional choice. *Sea Clammers* and *Smith* adopt the opposite assumption—that limitations upon the remedy contained in the statute are deliberate and are not to be evaded through § 1983. See *Smith,* 468 U. S., at 1011–1012, and n. 5; *Sea Clammers,* 453 U. S., at 14, 20.

Respondent disputes that a § 1983 action to enforce § 332(c)(7)(B) would enjoy a longer statute of limitations than an action under § 332(c)(7)(B)(v). He argues that the rule adopted in *Wilson* v. *Garcia,* 471 U. S. 261 (1985), that § 1983 claims are governed by the state-law statute of limitations for personal-injury torts, does not apply to § 1983 actions to enforce statutes that themselves contain a statute of limitations; in such cases, he argues, the limitations period in the federal statute displaces the otherwise applicable state statute of limitations. This contention cannot be reconciled with our decision in *Wilson,* which expressly rejected the proposition that the limitations period for a § 1983 claim depends on the nature of the underlying right being asserted. See *id.,* at 271–275. We concluded instead that 42 U. S. C. § 1988 is "a directive to select, in each State, the one most appropriate statute of limitations for *all* § 1983 claims." 471 U. S., at 275 (emphasis added); see also *Owens* v. *Okure,* 488 U. S. 235, 240–241 (1989) ("42 U. S. C. § 1988 requires courts to borrow and apply to *all § 1983 claims* the one most analogous state statute of limitations" (emphasis added)). We acknowledged that "a few § 1983 claims are based on statutory

rights," *Wilson, supra,* at 278, but carved out no exception for them.

Respondent also argues that, if 28 U. S. C. § 1658 (2000 ed., Supp. II), rather than *Wilson,* applies to his § 1983 action, see n. 5, *supra,* § 1658's 4-year statute of limitations is inapplicable. This is so, he claims, because § 332(c)(7)(B)(v)'s requirement that actions be filed within 30 days falls within § 1658's prefatory clause, "Except as otherwise provided by law." [6] We think not. The language of § 332(c)(7)(B)(v) that imposes the limitations period ("within 30 days after such action or failure to act") is inextricably linked to—indeed, is embedded within—the language that creates the right of action ("may . . . commence an action in any court of competent jurisdiction"). It cannot possibly be regarded as a statute of limitations generally applicable to *any* action to enforce the rights created by § 332(c)(7)(B). Cf. *Agency Holding Corp.* v. *Malley-Duff & Associates, Inc.,* 483 U. S. 143, 168 (1987) (SCALIA, J., concurring in judgment) ("Federal statutes of limitations . . . are almost invariably tied to specific causes of action"). Respondent's argument thus reduces to a suggestion that we "borrow" § 332(c)(7)(B)(v)'s statute of limitations and attach it to § 1983 actions asserting violations of § 332(c)(7)(B). Section 1658's "[e]xcept as otherwise provided by law" clause does not support this suggestion.

## C

The Ninth Circuit based its conclusion that Congress intended to permit plaintiffs to proceed under § 1983, in part, on the TCA's so-called "saving clause," TCA § 601(c)(1), 110 Stat. 143, note following 47 U. S. C. § 152. 354 F. 3d, at 1099–1100. That provision reads as follows:

---

[6] Title 28 U. S. C. § 1658(a) provides as follows:

"Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."

"(1) NO IMPLIED EFFECT—This Act and the amend-
ments made by this Act shall not be construed to modify,
impair, or supersede Federal, State, or local law unless
expressly so provided in such Act or amendments."

The Court of Appeals took this to be an express statement
of Congress's intent *not* to preclude an action under § 1983,
reasoning that to do so would be to "'impair'" the operation
of that section. *Id.*, at 1100.

We do not think this an apt assessment of what "impair-
[ment]" consists of. Construing § 332(c)(7), as we do, to cre-
ate rights that may be enforced only through the statute's
express remedy leaves the pre-TCA operation of § 1983 en-
tirely unaffected. Indeed, the crux of our holding is that
§ 332(c)(7) has no effect on § 1983 whatsoever: The rights
§ 332(c)(7) created may not be enforced under § 1983 and, con-
versely, the claims available under § 1983 prior to the enact-
ment of the TCA continue to be available after its enactment.
The saving clause of the TCA does not require a court to go
further and permit enforcement under § 1983 of the TCA's
substantive standards. To apply to the present case what
we said with regard to a different statute: "The right
[Abrams] claims under [§ 332(c)(7)] did not even arguably
exist before the passage of [the TCA]. The only question
here, therefore, is whether the rights created by [the TCA]
may be asserted within the *remedial* framework of [§ 1983]."
*Great American Fed. Sav. & Loan Assn.* v. *Novotny*, 442
U. S. 366, 376–377 (1979).

This interpretation of the saving clause is consistent with
*Sea Clammers.* Saving clauses attached to the statutes at
issue in that case provided that the statutes should *not* be
interpreted to "'restrict any right which any person . . . may
have under any statute or common law to seek enforcement
of any . . . standard or limitation or to seek any other re-
lief (including relief against the Administrator or a State
agency).' 33 U. S. C. § 1365(e)." 453 U. S., at 7, n. 10; see

also *id.*, at 7–8, n. 11. We refused to read those clauses to "preserve" a § 1983 action, holding that they did not "refer . . . to a suit for redress of a violation of th[e] statutes [at issue] . . . ." *Id.*, at 20–21, n. 31.

\* \* \*

Enforcement of § 332(c)(7) through § 1983 would distort the scheme of expedited judicial review and limited remedies created by § 332(c)(7)(B)(v). We therefore hold that the TCA—by providing a judicial remedy different from § 1983 in § 332(c)(7) itself—precluded resort to § 1983. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE O'CONNOR, JUSTICE SOUTER, and JUSTICE GINSBURG join, concurring.

I agree with the Court. It wisely rejects the Government's proposed rule that the availability of a private judicial remedy *"conclusively establishes* . . . a congressional intent to preclude [Rev. Stat. § 1979, 42 U. S. C.] § 1983 relief." *Ante*, at 122 (emphasis added). The statute books are too many, federal laws too diverse, and their purposes too complex for any legal formula to provide more than general guidance. Cf. *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 291 (2002) (BREYER, J., concurring in judgment). The Court today provides general guidance in the form of an "ordinary inference" that when Congress creates a specific judicial remedy, it does so to the exclusion of § 1983. *Ante*, at 122. I would add that context, not just literal text, will often lead a court to Congress' intent in respect to a particular statute. Cf. *ibid.* (referring to "implicit" textual indications).

Context here, for example, makes clear that Congress saw a national problem, namely, an "inconsistent and, at times,

conflicting patchwork" of state and local siting requirements, which threatened "the deployment" of a national wireless communication system. H. R. Rep. No. 104–204, pt. 1, p. 94 (1995). Congress initially considered a single national solution, namely, a Federal Communications Commission wireless tower siting policy that would pre-empt state and local authority. *Ibid.;* see also H. R. Conf. Rep. No. 104–458, p. 207 (1996). But Congress ultimately rejected the national approach and substituted a system based on cooperative federalism. *Id.,* at 207–208. State and local authorities would remain free to make siting decisions. They would do so, however, subject to minimum federal standards—both substantive and procedural—as well as federal judicial review.

The statute requires local zoning boards, for example, to address permit applications "within a reasonable period of time"; the boards must maintain a "written record" and give reasons for denials "in writing." 47 U. S. C. §§ 332(c)(7)(B)(ii), (iii). Those "adversely affected" by "final action" of a state or local government (including their "failure to act") may obtain judicial review provided they file their review action within 30 days. § 332(c)(7)(B)(v). The reviewing court must "hear and decide such action on an expedited basis." *Ibid.* And the court must determine, among other things, whether a zoning board's decision denying a permit is supported by "substantial evidence." § 332(c)(7)(B)(iii).

This procedural and judicial review scheme resembles that governing many federal agency decisions. See H. R. Conf. Rep. No. 104–458, at 208 ("The phrase 'substantial evidence contained in a written record' is the traditional standard used for judicial review of agency actions"). Section 1983 suits, however, differ considerably from ordinary review of agency action. The former involve plenary judicial evaluation of asserted rights deprivations; the latter involves deferential consideration of matters within an agency's expertise. And, in my view, to permit § 1983 actions here would under-

mine the compromise—between purely federal and purely local siting policies—that the statute reflects.

For these reasons, and for those set forth by the· Court, I agree that Congress, in this statute, intended its judicial remedy as an exclusive remedy. In particular, Congress intended that remedy to foreclose—not to supplement— § 1983 relief.

JUSTICE STEVENS, concurring in the judgment.

When a federal statute creates a new right but fails to specify whether plaintiffs may or may not recover damages or attorney's fees, we must fill the gap in the statute's text by examining all relevant evidence that sheds light on the intent of the enacting Congress. The inquiry varies from statute to statute. Sometimes the question is whether, despite its silence, Congress intended us to recognize an implied cause of action. See, *e. g.*, *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979). Sometimes we ask whether, despite its silence, Congress intended us to enforce the preexisting remedy provided in Rev. Stat. § 1979, 42 U. S. C. § 1983. See *Maine* v. *Thiboutot*, 448 U. S. 1, 4 (1980). And still other times, despite Congress' inclusion of specific clauses designed specifically to preserve pre-existing remedies, we have nevertheless concluded that Congress impliedly foreclosed the § 1983 remedy. See *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 13 (1981). Whenever we perform this gap-filling task, it is appropriate not only to study the text and structure of the statutory scheme, but also to examine its legislative history. See, *e. g.*, *id.*, at 17–18; *Smith* v. *Robinson*, 468 U. S. 992, 1009 (1984); *Cannon*, 441 U. S., at 694.

In this case the statute's text, structure, and history all provide convincing evidence that Congress intended the Telecommunications Act of 1996 (TCA) to operate as a comprehensive and exclusive remedial scheme. The structure of the statute appears fundamentally incompatible with the

private remedy offered by § 1983.*   Moreover, there is not a shred of evidence in the legislative history suggesting that, despite·this structure, Congress intended plaintiffs to be able to recover damages and attorney's fees.   Thus, petitioners have made "the *difficult showing* that allowing § 1983 actions to go forward in these circumstances 'would be inconsistent with Congress' carefully tailored scheme.'"   *Blessing* v. *Freestone,* 520 U. S. 329, 346 (1997) (quoting *Golden State Transit Corp.* v. *Los Angeles,* 493 U. S. 103, 107 (1989); emphasis added).   I therefore join the judgment of the Court without reservation.

Two flaws in the Court's approach, however, persuade me to write separately.   First, I do not believe that the Court has properly acknowledged the strength of our normal presumption that Congress intended to preserve, rather than preclude, the availability of § 1983 as a remedy for the enforcement of federal statutory rights.   Title 42 U. S. C.

---

*The evidence supporting this conclusion is substantial.   It includes, *inter alia,* the fact that the private remedy specified in 47 U. S. C. § 332(c)(7)(B)(v) requires all enforcement actions to be brought in any court of competent jurisdiction "within 30 days after such action or failure to act."   Once a plaintiff brings such an action, the statute requires the court both to "hear and decide" the case "on an expedited basis." *Ibid.* As the Court properly notes, *ante,* at 122–123, the TCA's streamlined and expedited scheme for resolving telecommunication zoning disputes is fundamentally incompatible with the applicable limitations periods that generally govern § 1983 litigation, see, *e. g., Wilson* v. *Garcia,* 471 U. S. 261 (1985), as well as the deliberate pace with which civil rights litigation generally proceeds.   See, *e. g.,* H. R. Conf. Rep. No. 104–458, pp. 208–209 (1996) (expressing the intent of the congressional Conference that zoning decisions should be "rendered in a reasonable period of time" and that Congress expected courts to "act expeditiously in deciding such cases" that may arise from disputed decisions).   Like the Court, I am not persuaded that the statutory requirements can simply be mapped onto the existing structure of § 1983, and there is nothing in the legislative history to suggest that Congress would have wanted us to do so.   For these reasons, among others, I believe it is clear that Congress intended § 332(c)(7) to operate as the exclusive remedy by which plaintiffs can obtain judicial relief for violations of the TCA.

§ 1983 was "intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 700–701 (1978). "We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy . . . . Since 1871, when it was passed by Congress, § 1983 has stood as an independent safeguard against deprivations of federal constitutional and statutory rights." *Smith*, 468 U. S., at 1012. Although the Court is correct to point out that this presumption is rebuttable, it remains true that only an *exceptional* case—such as one involving an unusually comprehensive and exclusive statutory scheme—will lead us to conclude that a given statute impliedly forecloses a § 1983 remedy. See *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 425 (1987) (statutory scheme must be "sufficiently comprehensive and effective to raise a clear inference that Congress intended to foreclose a § 1983 cause of action"). While I find it easy to conclude that petitioners have met that heavy burden here, there will be many instances in which § 1983 will be available even though Congress has not explicitly so provided in the text of the statute in question. See, *e. g., id.*, at 424–425; *Blessing*, 520 U. S., at 346–348.

Second, the Court incorrectly assumes that the legislative history of the statute is totally irrelevant. This is contrary to nearly every case we have decided in this area of law, all of which have surveyed, or at least acknowledged, the available legislative history or lack thereof. See, *e. g., Wright*, 479 U. S., at 424–426 (citing legislative history); *Smith*, 468 U. S., at 1009–1010 (same); *Sea Clammers*, 453 U. S., at 17–18 (noting that one of the relevant factors in the Court's inquiry "include[s] the legislative history"); *Cannon*, 441 U. S., at 694 (same).

Additionally, as a general matter of statutory interpretation, Congress' failure to discuss an issue during prolonged legislative deliberations may itself be probative. As THE

CHIEF JUSTICE has cogently observed: "In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night." *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 602 (1980) (dissenting opinion). The Court has endorsed the view that Congress' silence on questions such as this one "can be likened to the dog that did not bark." *Chisom* v. *Roemer*, 501 U. S. 380, 396, n. 23 (1991) (citing A. Doyle, Silver Blaze, in The Complete Sherlock Holmes 335 (1927)). Congressional silence is surely probative in this case because, despite the fact that awards of damages and attorney's fees could have potentially disastrous consequences for the likely defendants in most private actions under the TCA, see *Primeco Personal Communications* v. *Mequon*, 352 F. 3d 1147, 1152 (CA7 2003), nowhere in the course of Congress' lengthy deliberations is there any hint that Congress wanted damages or attorney's fees to be available. That silence reinforces every other clue that we can glean from the statute's text and structure.

For these reasons, I concur in the Court's judgment.