**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| OMNIPOINT COMMUNICATIONS, INC., a Delaware corporation, DBA T-Mobile, | Nos. 10-56877 10-56944 |
| *Plaintiff-Appellee/ Cross-Appellant*, | D.C. No. 2:09-cv-03777-RGK-SS |
| v. | |
| CITY OF HUNTINGTON BEACH a public entity organized and existing under the laws of the State of California, CITY COUNCIL OF THE CITY OF HUNTINGTON BEACH, | OPINION |
| *Defendants-Appellants/ Cross-Appellees*. | |

Appeals from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued November 6, 2012
Resubmitted December 4, 2013
Pasadena, California

Filed December 11, 2013

Before: Susan P. Graber, Sandra S. Ikuta,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY[*]

### Telecommunications Act of 1996

Reversing the district court's judgment, the panel held that the Telecommunications Act of 1996 did not preempt the City of Huntington Beach's decision to require a company to obtain voter approval before constructing a mobile telephone antenna on city-owned park property.

The panel held that 47 U.S.C. § 332(c)(7)(A) functions to preserve local land use authorities' legislative and adjudicative authority subject to certain substantive and procedural limitations. The panel held that § 332(c)(7) has the following preemptive scope: (1) it preempts local land use authorities' regulations if they violate the requirements of § 332(c)(7)(B)(i) and (iv); and (2) it preempts local land use authorities' adjudicative decisions if the procedures for making such decisions do not meet the minimum requirements of § 332(c)(7)(B)(ii) and (iii).

The panel held that the City's "Measure C," which amended the City charter to impose certain limits on the City's ability to authorize use of city-owned property, was not

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a land use regulation or decision subject to the limitations of § 332(c)(7), but rather was a voter-enacted rule that the City could not lease or sell city-owned property for certain types of construction unless authorized by a majority of the electors. Agreeing with the Second Circuit, the panel held that Measure C, therefore, was not preempted by the Telecommunications Act of 1996.

## COUNSEL

Jennifer McGrath, City Attorney, and Scott F. Field (argued), Assistant City Attorney, Huntington Beach, California, for Defendants-Appellants/Cross-Appellees.

Martin L. Fineman (argued), Davis Wright Tremaine LLP, San Francisco, California; John J. Flynn III and Benjamin Z. Rubin, Nossaman LLP, Irvine, California, for Plaintiff-Appellee/Cross-Appellant.

## OPINION

IKUTA, Circuit Judge:

The City of Huntington Beach appeals the district court's determination that the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended at U.S.C. Titles 15, 18, and 47) (the TCA), preempted its decision to require Omnipoint Communications, Inc. (doing business as "T-Mobile"), to obtain voter approval before constructing mobile telephone antennae on city-owned park property. T-Mobile cross-appeals the district court's denial of permanent

injunctive relief.  We conclude that the City's decision was not preempted and consequently reverse the district court.

I

We first consider the preemptive scope of the TCA. Because congressional intent "is the ultimate touchstone of preemption analysis," when "Congress adopts a statute that provides a reliable indication of Congressional intent regarding preemption, the scope of federal preemption is determined by the statute." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1040 (9th Cir. 2007) (internal quotation marks omitted).  Although congressional intent "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it," also relevant are "the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect . . . the law" and parties whose actions are affected by the statute.  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (internal quotation marks and citations omitted); *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (explaining that Congress's intent to preempt "may be explicitly stated in the statute's language or implicitly contained in its structure and purpose" (internal quotation marks omitted)).  Therefore, we begin by assessing the text of the relevant provisions of the TCA and their historical and statutory context.

In 1996, Congress passed the TCA to encourage the development of telecommunications technologies, including wireless telephone services.  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005).  Among other means to

this end, Congress enacted 47 U.S.C. § 332(c)(7), entitled "[p]reservation of local zoning authority," which "was intended to minimize federal interference with State and local land use decisions," *Kay v. City of Rancho Palos Verdes*, 504 F.3d 803, 813 (9th Cir. 2007), while still reducing "the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers," *Abrams*, 544 U.S. at 115.

As suggested by the title of § 332(c)(7), an understanding of the mechanics of local governments' zoning and land use decision making is necessary to discern the section's preemptive scope. *See Kay*, 504 F.3d at 813. In general, local governmental authorities, such as cities and counties, establish local zoning boards, planning commissions, or analogous entities to promulgate and enforce zoning and other land use restrictions within their jurisdiction. Patrick J. Rohan, *Zoning and Land Use Controls* § 1.02[1]–[2] (2012); Julian Conrad Juergensmeyer & Thomas E. Roberts, *Land Use Planning and Development Regulation Law* § 3.1 (3d ed. 2013); *see also Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 176, 180–81 (1985). Local land use decisions fall into two general categories. *See Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994) (contrasting "[t]he sort of land use regulations" that "involved essentially legislative determinations classifying entire areas of the city," with a city's "adjudicative decision to condition petitioner's application for a building permit on an individual parcel"). First, local land use authorities may recommend or enact plans and zoning maps that affect the classification and use of property generally. Juergensmeyer & Roberts, *supra*, at § 2:7. This is primarily a legislative function. *See* Rohan, *supra*, at § 1.03[2][a]; Cal. Gov't Code § 65301.5 (classifying the adoption of a general plan as a legislative act). Second,

local land use authorities may exercise an adjudicative function that involves applying land use rules to individual property owners, including the consideration of requests for waivers and variances. Juergensmeyer & Roberts, *supra*, at §§ 5:1, 5:3.

In addressing land use regulations and decisions related to the installation of wireless communication facilities, the TCA closely tracks the typical division of land use decision making. *See Kay*, 504 F.3d at 814 (noting that the text used in § 332(c)(7) "closely mirrors" state laws relating to zoning and permitting agency decisions). Congress began by enunciating a general principle of preservation of local authority:

> Except as provided in this paragraph [§ 332(c)(7)] nothing in this chapter[1] shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

47 U.S.C. § 332(c)(7)(A).

This preservation principle is subject to the limitations set forth in the subsections of § 332(c)(7)(B). Two of the four subsections, § 332(c)(7)(B)(i) and (iv), relate to the promulgation of generally applicable legislative regulations. Thus, § 332(c)(7)(B)(i) provides that the "regulation of the

---

[1] Section 332(c)(7) is codified within chapter five of Title 47 of the United States Code, which is entitled: "Wire or Radio Communication." *See* 47 U.S.C. §§ 151 et seq.

placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof shall not unreasonably discriminate among providers of functionally equivalent services" and "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." *Id.* § 332(c)(7)(B)(i)(I)–(II). Section 332(c)(7)(B)(iv) provides that "[n]o State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions" where the facilities otherwise comply with federal requirements. *Id.* § 332(c)(7)(B)(iv).

The other two subsections, § 332(c)(7)(B)(ii) and (iii), refer to the procedures used by local land use authorities in making adjudicative decisions. *See Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (noting that the TCA "clearly establishes procedural requirements that local boards must comply with in evaluating cell site applications"). These subsections provide:

> (ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.
>
> (iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify

> personal wireless service facilities shall be in
> writing and supported by substantial evidence
> contained in a written record.

*Id.* § 332(c)(7)(B)(ii)–(iii).   Under these subsections, local
zoning authorities must adopt administrative procedures
requiring timely, written decisions when adjudicating an
application for approval of a development project involving
"personal wireless service facilities." *Id.* § 332(c)(7)(B)(ii);
*see Kay*, 504 F.3d at 814–15.

We conclude that § 332(c)(7)(A) functions to preserve
local land use authorities' legislative and adjudicative
authority subject to certain substantive and procedural
limitations.    This conclusion clarifies the scope of
§ 332(c)(7)(A)'s preemptive effect.  Section 332(c)(7) does
not have a typical preemption clause that expressly preempts
state law, followed by a savings provision excepting certain
types of state enactments from preemption. *Cf.* 29 U.S.C.
§ 1144(a), (b)(2)(A) (stating that the provisions of ERISA
"shall supersede any and all State laws" as specified, except
as provided in the savings clause).  Rather, § 332(c)(7) takes
the opposite approach:  it begins with a savings clause, and
then makes the savings clause subject to exceptions.  Thus
§ 332(c)(7) expressly preserves local land use decisions, such
as decisions regarding "placement, construction, and
modification" of wireless facilities, and then makes this
preservation principle subject to a proviso:  "[*e*]*xcept* as
provided" in the rest of § 332(c)(7).  *Id.* § 332(c)(7)(A)
(emphasis added).  Although this approach reverses the order
of a typical preemption clause, it accomplishes the same goal:
by logical inference, Congress intended the proviso section to
preempt local land use authority that does not comply with
the requirements in § 332(c)(7)(B), while preserving local

zoning authority that complies with such requirements. *See MetroPCS v. City of S.F.*, 400 F.3d 715, 735–36 (9th Cir. 2005) (holding that the TCA preempts only those local zoning decisions that conflict with the TCA's "anti-discrimination and anti-prohibition provisions" and not decisions that are harmless to the FCC's regulatory scheme). Accordingly, we conclude that § 332(c)(7) has the following preemptive scope: (1) it preempts local land use authorities' regulations if they violate the requirements of § 332(c)(7)(B)(i) and (iv); and (2) it preempts local land use authorities' adjudicative decisions if the procedures for making such decisions do not meet the minimum requirements of § 332(c)(7)(B)(ii) and (iii).

## II

We next consider the facts of this case, including the pertinent legal framework for the City's decisions.

## A

This case implicates two different aspects of municipal authority:  the City's authority to enter into licenses of city-owned property, and the City's responsibility for making and implementing planning and zoning decisions.  First, as a charter city under California law, the City has plenary authority to control municipal property.  The California constitution reserves to charter cities the authority to "make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters."  Cal. Const. art. 11, § 5(a); *see also Simons v. City of L.A.*, 63 Cal. App. 3d 455, 467–68 (1976).  In 1990, an initiative known as Measure C amended the city charter to impose certain limits on the City's ability

to authorize use of city-owned property. This provision states:

> No . . . structure costing more than $100,000.00 may be built on or in any park or beach or portion thereof . . . unless authorized by the affirmative votes of at least a majority of the total membership of the City Council and by the affirmative vote of at least a majority of the electors voting on such proposition at a general or special election at which such proposition is submitted.[2]

According to the voter information pamphlet, which is "a proper extrinsic aid" to interpreting an initiative, *People v. Lester*, 220 Cal. App. 4th 291, 301 (2013), the purpose of Measure C was to allow "the citizens of Huntington Beach to have a direct vote in any future commercial development or sale of the city's parks and beaches," so as to put control of public park lands into the hands of the voters "and out of the reach of developers and special interest groups." By giving the voters authority over construction on public lands, Measure C operates as a limitation on the City's otherwise plenary authority over these lands.

Second, the City has obligations under state and local law for making and implementing land use decisions. Although charter cities are also exempt from many of the state local planning and zoning regulations provisions, *see* Cal. Gov't

---

[2] Measure C is now codified in § 612(b) of the City's charter, although the cost of a structure that triggers the provision's applicability has increased to $161,000 and continues to be adjusted annually. *See* Huntington Beach, Cal., Charter § 612(b).

Code §§ 65700, 65803, their legislative bodies "adopt general plans which contain the mandatory elements" set by state law. *Id.* § 65300; *see also id.* §§ 65302, 65700(b).  The City has established such a general plan, *see* Huntington Beach, Cal., Code § 201.06, and has also promulgated regulations to implement its own zoning and subdivision code, *id.* § 201.02. The City delegated the preparation and recommendation of legislative land use determinations, such as amendments to the general plan and zoning map, to a planning commission, *id.* §§ 2.34.020, 202.10(D); *see also id.* §§ 247.08, 247.10, subject to the City Council's final authority to approve or deny legislative determinations, *id.* § 202.10(A).  The City delegated its adjudicative land use decision-making authority to administrative bodies, primarily the planning commission and a zoning administrator. *See id.* § 202.10(D)–(E).  These administrative bodies adjudicate land use applications subject to the City Council's authority to act as a board of appeals. *Id.* § 202.10(A).

    The City's decision-making process is subject to typical administrative procedural requirements.  As relevant here, the planning commission, zoning administrator, or City Council must render its decision on an application or appeal "in the form of a written statement, minute order or resolution," which "shall be accompanied by reasons sufficient to inform as to the basis for the decision."  *Id.* § 248.10(A).  Further, "[t]he reviewing body shall formulate its written findings within five calendar days after the decision" and must provide notice of its decision to the applicant and any other party that requests such notice.  *Id.* § 248.10(B), (C).

    At the time of T-Mobile's application in 2007, the City Council had in place an ordinance establishing a procedure for the adjudication of applications to construct and modify

wireless communication facilities within city limits. *See id.* § 230.96(C).**³**  Under the regulations, a person wishing to install and operate a wireless communication facility, such as an antenna, must submit a permit application to the Planning and Building Department. *Id.* § 230.96(E)(1).**⁴**  After the department confirms that the application is complete, the applicant must obtain a wireless permit from the director of the department or a conditional use permit from the zoning administrator. *Id.* § 230.96(E)(2)–(3).  The applicant can appeal a denial of the permit to the planning commission. *Id.* § 230.96(E)(2)(d), (3)(c).**⁵**  The City Council is the final arbiter of any appeal of the planning commission's adjudication of a permit application. *Id.* § 202.10(A).

## B

In July 2007, T-Mobile submitted two applications to the City's Planning and Building Department for wireless permits to construct wireless antennae in Harbour View Park and Bolsa View Park.  The applications identified the City as the property owner of the parcel where the antennae would be

---

**³** At the time of T-Mobile's application, an earlier version of the ordinance, Huntington Beach, Cal., Ordinance 3568, § 10 (Aug. 5, 2002), was in effect.  Because the subsequent amendments to this ordinance do not change our analysis, we cite the current version of the ordinance to avoid confusion.

**⁴** The requirement that an application first be submitted to the Planning and Building Department did not appear in the original ordinance. *See id.*

**⁵** In the earlier version of the ordinance, § 202.10(D) of the zoning and subdivision code established the planning commission's authority to hear appeals from the decisions of the director and zoning administrator. *See* Huntington Beach, Cal., Code § 202.10(D).

located.   Under the director's authority, *see* Huntington Beach, Cal., Code § 230.96(E)(2), the Planning and Building Department approved T-Mobile's requests for the two wireless permits shortly thereafter, in August and September 2007.

After obtaining these permits, T-Mobile commenced lease negotiations with the City, and ultimately entered into Site License Agreements to lease space in each park for the antennae.  The agreements were executed by the City's mayor in December 2008 and approved unanimously by the City Council in January 2009.   Under the Site License Agreements, the City, as owner of the property, authorized T-Mobile to install and maintain its wireless facility on the City's premises, for which T-Mobile would pay a licensing fee.

After obtaining the Site License Agreements, T-Mobile applied to the City's Building and Safety Department for building permits to begin construction of the facilities.  In its applications, T-Mobile reported that the "Total Construction Valuation" of the Bolsa View and Harbour View antennae were $80,000 and $60,000, respectively.   After the department issued these building permits in April 2009, T-Mobile began to construct the Harbour View site antenna.

After construction commenced at Harbour View, local residents who opposed the construction commenced aggressive protests that blocked activities at the site.  T-Mobile agreed to stop construction temporarily pending the City's efforts to resolve this unexpected public opposition.  In subsequent communications between T-Mobile and City representatives, the City learned that the "total construction value" of the projects that T-Mobile had reported on the

applications for building permits did not reflect the total construction *costs*, which would substantially exceed $100,000 for each antenna.

In April 2009, the City held a special meeting of the City Council, at which residents spoke against the construction of an antenna at the Harbour View location. At a subsequent closed session, the City Council determined that, although T-Mobile had valid land use and building permits and valid Site License Agreements, T-Mobile still was required to obtain voter approval under Measure C before it could proceed with construction. Accordingly, on July 23, 2009, the City Attorney sent T-Mobile a letter stating that the City "continues to recognize the validity of the Site Licenses and the Wireless Permits," but because the construction costs for each wireless facility exceeded $100,000, the City was obliged to enforce Measure C. Therefore, the City Attorney directed the Building and Safety Department to suspend the building permits until T-Mobile obtained voter approval.

Instead of seeking voter approval, T-Mobile filed a complaint in federal district court in May 2009 and moved for preliminary injunctive relief to prevent the City from requiring compliance with Measure C. T-Mobile argued that the TCA barred the City from applying Measure C to T-Mobile's proposed projects. The City filed a motion to dismiss on the ground that it had acted as a participant in the market, rather than as a regulator, and therefore the "market participant doctrine" shielded its decisions regarding the use of its own property from federal preemption.

In October 2009, the district court denied the pretrial motions submitted by T-Mobile and the City. First, it denied T-Mobile's motion for preliminary injunctive relief because

T-Mobile had not sufficiently demonstrated a likelihood of irreparable harm. The court also rejected the City's argument that it could avoid the TCA's preemptive effect because it had acted as a market participant and not as a regulator, holding that Measure C was a regulation in both form and substance.

T-Mobile and the City then filed cross-motions for partial summary judgment. In July 2010, the district court denied the City's motion and granted T-Mobile's motion in part. The court held that the TCA required the City to process T-Mobile's applications for building permits within a reasonable period of time, and to explain the reason for denial of the applications in writing, supported by substantial evidence. 47 U.S.C. § 332(c)(7)(B)(ii)–(iii). Because the voter approval process required by Measure C did not meet these procedural requirements, the court concluded that the City could not use Measure C as a reason to deny T-Mobile's applications or to delay making a decision. The court gave the City sixty days either to grant T-Mobile's permit applications, or to deny the applications in a manner that complied with the procedural requirements of the TCA.

On remand from the district court, the City Council followed the procedures set forth in the TCA to revoke the permits for both antennae in August 2010.[6]  T-Mobile challenged this permit revocation in a separate action, *Omnipoint Commc'ns d/b/a T-Mobile v. Huntington Beach*,

---

[6] In the November 2010 general election, the voters of Huntington Beach disapproved construction of T-Mobile's proposed antennae. On November 12, 2010, the district court entered a final judgment granting T-Mobile's request for declaratory relief and denying its request for injunctive relief pursuant to the July 9, 2010 order. The court also dismissed T-Mobile's remaining claims as moot.

C.D. Cal. Case No. CV10-1471-RGK ("*T-Mobile II*"), which resulted in a settlement in March 2012 solely as to T-Mobile's application to construct an antenna at the Harbour View site.  The parties agreed that this action would proceed with respect to T-Mobile's application to construct an antenna at the Bolsa View site.

On appeal, the City claims that the district court erred in prohibiting it from delaying its decision on T-Mobile's permit applications until T-Mobile had obtained the approval of the voters pursuant to Measure C.  As it argued before the district court, the City asserts that the TCA did not preempt its decision to require compliance with Measure C, because the market participant doctrine shields the City's decisions about use of its own property from federal preemption.  In the alternative, the City contends that its application of Measure C is not preempted because it is consistent with the TCA's procedural requirements.  On cross-appeal, T-Mobile claims that the district court should have issued a permanent injunction ordering the City to let T-Mobile resume construction, and should not have remanded the case to the City for reconsideration of T-Mobile's permits.  We have jurisdiction under 28 U.S.C. § 1291.

III

Given our conclusion that the TCA preempts a local land use authority's legislative regulations if they fail to incorporate the requirements of § 332(c)(7)(B)(i) and (iv), and preempts its adjudicative decisions if the procedures for making such decisions do not meet the minimum requirements of § 332(c)(7)(B)(ii) and (iii), we begin with the threshold question whether Measure C is such a regulation or decision.

On its face, Measure C is not the sort of local land use regulation or decision that is subject to the limitations of § 332(c)(7), but rather is a voter-enacted rule that the City may not lease or sell city-owned property for certain types of construction unless authorized by a majority of the electors. *Cf. Simons*, 63 Cal. App. 3d at 468; Cal. Const. art. 11, § 5(a). Unlike a legislative land use regulation, Measure C does not classify public and private property or impose design and use restrictions on the different classifications. Indeed, Measure C does not prevent the City from agreeing to any sort of construction or use of public land, provided that the City obtains public approval. Nor was Measure C promulgated by the local governmental authorities (i.e., the City Council or Planning Commission) that are authorized by law to engage in such legislative land use decision making. Measure C simply provides a mechanism for the City, through the voters, to decide whether to allow construction on its own land. It does not regulate or impose generally applicable rules on "the placement, construction, and modification of personal wireless service facilities," § 332(c)(7)(B)(i) and (iv), and so the substantive limitations imposed by these subsections are inapplicable.

Second, Measure C is not the sort of local land use decision that fulfills an adjudicative function and that therefore must meet the procedural constraints of § 332(c)(7)(B)(ii) and (iii). Rather, Measure C gives the voters an unconstrained right to approve or disapprove a proposed construction project on city-owned park lands, and thus serves as a constraint on the City's plenary power to control the use of public lands. The voters need not consider whether the project meets any particular criteria, and their determination is not subject to review or appeal, unlike adjudicative decisions by the City's Planning Commission

and zoning administrator. Because Measure C merely restrains the City's actions as a property owner and does not affect the City's administrative procedures for approving or denying a request "to place, construct, or modify personal wireless service facilities," § 332(c)(7)(B)(ii) and (iii), the minimum procedural requirements established by these sections are likewise inapplicable.

That the requirements imposed by Measure C are not part of a local government's zoning and land use decision-making process is clear from the facts of this case. The City's adjudicative decision making in response to T-Mobile's applications was fully compliant with the TCA: both the City's Planning and Building Department and its Building and Safety Department approved T-Mobile's applications in writing within a reasonable period of time. The City's July 2009 letter to T-Mobile affirmed the validity of these administrative decisions. But a building permit does not give a builder the authority to begin construction on property belonging to a third party; rather, the builder must secure the third party's permission. Here, the City's authority to give such permission via the Site License Agreement was limited by Measure C. The Site License Agreement itself required T-Mobile's compliance with all "ordinances and regulations of general application now in effect or subsequently enacted" (which would include Measure C) as a condition of the license. Thus, once it became clear that T-Mobile's proposed project triggered Measure C, T-Mobile lacked the necessary land owner permission until Measure C's requirements were discharged. In other words, Measure C had an effect on landowner approval, not on the City's adjudicative process.

In sum, the voter-approval requirement imposed by Measure C is outside the City's framework for land use

decision making because it does not implicate the regulatory and administrative structure established by the City's general plans and zoning and subdivision code. By its terms, the TCA applies only to local zoning and land use decisions and does not address a municipality's property rights as a landowner. Because the requirements imposed by Measure C fall outside the TCA's preemptive scope, the city charter provision is not preempted by § 332(c)(7)(B).

The Second Circuit reached a similar conclusion in *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 407 (2d Cir. 2002). In that case, a school district entered into a lease agreement permitting Sprint to build an antenna on the roof of a public high school, subject to specified limitations on levels of radio emissions. *Id.* at 407–08. After Sprint informed the school district that it would install equipment that exceeded those limits, the district barred Sprint from commencing construction. *Id.* at 410. Sprint sued, arguing that the school district's decision was preempted by § 332(c)(7)(B)(iv), which prohibits local authorities from "regulat[ing] the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions."     47 U.S.C. § 332(c)(7)(B)(iv).

The Second Circuit disagreed, holding that "the language and structure of the TCA implicitly recognize that some governmental decisions are not regulatory," and thus are not preempted by the TCA. *Sprint Spectrum*, 283 F.3d at 420. Because § 332(c)(7)(B)(iv) does not preempt governmental actions that involve the management of its own property, the court concluded that the school district's decisions relating to leasing its roof was not preempted. *Id.* at 417–21.

As in *Sprint Spectrum*, the City's exercise of its property rights in accordance with Measure C here was non-regulatory and non-adjudicative behavior akin to an action by a private land owner.  *See id.*  Because the City's determination that it could not license T-Mobile's use of the city-owned Bolsa View Park without voter approval is not the type of zoning and land use decision covered by § 332(c)(7), we conclude that it was not preempted by that section.[7]  We reverse and remand for proceedings consistent with this opinion.[8]

**REVERSED AND REMANDED.**

---

[7] Because we decide on this basis, we need not address the City's argument that Measure C is not subject to preemption due to a freestanding "market participant exception."  *See Am. Trucking Ass'ns v. City of L.A.*, 133 S. Ct. 2096, 2102 n.4, 2103–05 (2013) (holding that the Court did not need to address whether "a freestanding 'market-participant exception'" limited the express terms of a preemption clause, because the appellants had abandoned that argument, and concluding that the regulation at issue was preempted by the plain terms of the federal preemption clause).

[8] Our disposition of the City's appeal renders T-Mobile's cross-appeal seeking a permanent injunction moot.