[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 15-12067

————————————————

D.C. Docket No. 3:14-cv-00087-CDL

ATHENS CELLULAR, INC.,
d.b.a. Verizon Wireless,

Plaintiff - Appellant,

versus

OCONEE COUNTY, GEORGIA, et al.,

Defendants - Appellees.

————————————————

Appeal from the United States District Court
for the Middle District of Georgia

————————————————

(April 2, 2018)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and KAPLAN,[*] District
Judge.

TJOFLAT, Circuit Judge:

---

[*] Honorable Lewis A. Kaplan, Senior District Judge for the United States District Court
for the Southern District of New York, sitting by designation.

Congress enacted the Telecommunications Act of 1996 ("the TCA") to "promote competition and higher quality in American telecommunications services [and] encourage the rapid deployment of new telecommunications technologies" by, among other things, "reduci[ng] impediments imposed by local governments" to the installation of wireless communications facilities.  *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115, 125 S. Ct. 1453, 1455 (2005).  Although state and local governments retain "the authority . . . over decisions regarding the placement, construction, and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A), their decisionmaking is subject to certain substantive and procedural limitations.   For example, "[t]he regulation of the placement, construction, and modification of personal wireless service facilities . . . shall not unreasonably discriminate among providers of functionally equivalent services; and . . . shall not prohibit or have the effect of prohibiting the provision of [such] services."  *Id.* § 332(c)(7)(B)(i)(I)–(II).  "A State or local government . . . shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time . . . , taking into account the nature and scope of such request."  *Id.* § 332(c)(7)(B)(ii).  And "[a]ny decision . . . to deny a request [for such authorization] shall be in writing and supported by substantial evidence."  *Id.* § 332(c)(7)(B)(iii).  Congress imposed these limitations on the local permitting process for the construction of cellular communications

2

towers in order to facilitate broader extension of wireless services to the American people.  *See Abrams*, 544 U.S. at 115, 125 S. Ct. at 1455.

The denial of a request for authorization to construct a cellular communications tower, if made in derogation of the § 332(c)(7)(B) limitations, is subject to challenge in federal court.  "Any person adversely affected by any final action by a State or local government . . . that is inconsistent with [§ 332(c)(7)(B)'s limitations] may, within 30 days after such action . . . , commence an action in any court of competent jurisdiction."  47 U.S.C. § 332(c)(7)(B)(v).

Verizon brought this lawsuit against Oconee County, Georgia, and the Oconee County Board of Commissioners ("the Board") to challenge the decision of the Board denying its application for a special use permit to construct a cellular communications tower.[1]  Verizon alleged that the Board's decision had the effect of prohibiting its provision of personal wireless services, in violation of § 332(c)(7)(B)(i)(II); and that it was not supported by substantial evidence, as required by § 332(c)(7)(B)(iii).  Verizon asked the Court to issue an injunction requiring the Board to issue of the permit it seeks.[2]  The County, answering

---

[1] In addition to the County and the Board, Verizon named as defendants the Board's members, in their individual and official capacities.

[2] Verizon's complaint contains three counts.  Count I alleges that the Board effectively prohibited its provision of personal wireless services because in denying the use permit, it prevented Verizon from closing a "significant gap" in its services and there was no "reasonable alternative location" for the facility it needed.  Count II alleges that the Board's decision "was not based on substantial evidence."  Count III, which incorporates Counts I and

Verizon's complaint on behalf of itself and the Board, denied Verizon's allegations and asserted twelve affirmative defenses.  A single affirmative defense, the eleventh, is pertinent here: the County alleged that the District Court lacked jurisdiction because Verizon did not file suit within the TCA's thirty-day limitations period.

The District Court, after considering the parties' submissions relating to that affirmative defense, dismissed the action as time-barred, reasoning that the thirty-day limitations period began to run when the Oconee County Clerk ("the Clerk"), pursuant to custom, entered a document evidencing the Board's vote in the County's Ordinances and Resolutions books.[3]  Verizon now appeals the Court's decision.

The question in this appeal is whether the TCA's statute of limitations began to run when the Clerk entered a document in the Ordinances and Resolutions books or when the Board formally approved the minutes of the meeting at which it had

---

II, asks the District Court to declare the Board's action in violation of the § 332(c)(7)(B) limitations cited and to enjoin the Board "to issue immediately all approvals and permits, including without limitation all special use permits and building permits, necessary to allow construction and operation of the wireless facility."

[3] Specifically, the Document was placed in Ordinances and Resolutions Book No. 20 ("Book 20").  The County Clerk's duties included serving as the Board's Clerk.

voted to deny the application.  The District Court chose the former event.  We reverse. [4]

## I.

## A.

On May 30, 2014, Verizon submitted an application to the Oconee County Planning Department for a Special Use Permit to construct a cellular communications tower that would enhance its wireless service.  The Planning Department staff found that Verizon's proposal met the requirements of the

---

[4] Pending before this Court is the County's motion to dismiss this appeal on the ground that Verizon lacks standing to prosecute it.  We deny the motion as meritless.

As an affirmative defense to Verizon's complaint, the County challenged Verizon's constitutional standing to bring this action and therefore challenged the District Court's jurisdiction to entertain it.  The District Court, in terminating the action on the statute of limitations ground, necessarily decided that Verizon had constitutional standing to bring the lawsuit.  The County did not cross-appeal the Court's action.

The County does not deny that Verizon had a right to seek a special use permit, nor could it.  Section 1206.02(b) of the Oconee County Unified Development Code authorizes persons other than property owners to pursue such applications as long as the person filing the special use permit includes an authorization form executed by the owner of the property "authorizing the applicant to represent and act on behalf of the owner."  Here, Verizon complied with this section, obtaining and attaching a Notarized Authorization By Property Owner to the application.  By signing the form, the property owner indicated that she authorized Verizon to "act as the applicant in pursuit of [the] application."

As a result, in the words of the TCA, Verizon was "adversely affected by" the Board's denial of the permit. When the County denied Verizon's application, Verizon suffered an injury in fact because it was unable to pursue construction of the proposed tower.  We have previously agreed with a district court's determination that a plaintiff had standing to bring its application before a zoning board and had standing to bring a Section 332(c)(7)(B)(iii) claim when it obtained a Limited Authorization to Act as Applicant from the property owner.  *See Am. Tower, L.P. v. City of Huntsville*, No. CV-99-B-2933-NE, 2000 WL 34017802, at *4 (N.D. Ala. Sept. 29, 2000), *aff'd*, 295 F.3d 1203, 1206 n.2 (11th Cir. 2002).  There, we cited the "usual rules of agency" in agreeing that the plaintiff had standing.  295 F. 3d at 1206 n.2.  We see no material distinction between that case and the one before us.  As such, Verizon had a right to bring this action, and further, to appeal the District Court's adverse decision.

5

Oconee County Unified Development Code ("County Code") and recommended conditional approval of Verizon's application. The application proceeded on to the Oconee Planning Commission, which held a public hearing on the application on July 21, 2014, and subsequently recommended its denial. Verizon's application, along with the Planning Commission's recommendation, then continued automatically to the Board for consideration. *See* County Code § 12.08.03.

At its regular monthly meeting on August 5, 2014, the Board held a public hearing on Verizon's application. The Board heard from Verizon's attorney and several concerned residents who opposed granting the permit. The Commissioners then voted two to one to deny the application.[5] After the meeting adjourned that day, the Commissioners signed a document entitled "Action Denying Special Use Approval Request" ("the Document").[6] Below a description of Verizon's application,[7] the Document simply read: "After consideration and a motion and

---

[5] Four of the five members of the Board were present at the meeting (the Chairman was absent due to a personal matter). Only three members voted.

[6] All four Board members present at the meeting signed the Document. The County Clerk also signed the Document to attest to the four commissioners' signing. In the place for the Chairman's signature on the resolution is a notation reading: "Chair Absent due to [a personal matter]." The Chairman reviewed the Document before the County Clerk placed it in Book 20.

[7] This Document described Verizon's application thusly:
APPLICATION SUBMITTED BY:  Jennifer A. Blackburn, Attorney for Verizon Wireless APPLICATION SUBMISION DATE: June 2, 2014

RE:     Request for Special Use Approval on a ±42.38 acre tract of land located on the west side of McRees Mill Road in the 225th G.M.D., Oconee County, Georgia, (TP# D-1-14), on property owned by Sarah Marlena Deck, for the purpose of a Telecommunication Tower.

second, the Oconee County Board of Commissioners does hereby deny the above-referenced request for Special Use Approval." The Clerk then forwarded a copy of the Document internally to the Oconee County planning and zoning department on August 6, 2014. The planning department kept that copy in its file. On August 7, after the Board Chairman reviewed the Document, the Clerk placed a copy of the Document in the Ordinances and Resolutions books (specifically, in Book 20), according to "customary procedure."[8]

On September 2, 2014, at its regular monthly meeting, the Board approved the minutes of the August 5 meeting at which it had voted on Verizon's application.[9] On September 5, Verizon asked the Clerk for a copy of the minutes of the August 5 meeting. The Clerk responded that the minutes were available on the County's website. That same day, Verizon accessed the website and obtained a copy of the minutes. The minutes stated that the Board voted to deny the application and included the following reference: "***See Documentation in Ordinances and Resolutions Book No. 20***." (bold and italics in original).

---

[8] According to the Clerk's affidavit, "if the Chairman is not present, as was the case on August 5, 2014, the resolutions are placed in the book after he has had an opportunity to review them."

In addition, the Clerk "recorded" the "original Resolution . . . in the official Minute Book of Oconee County." The record does not indicate when the Clerk did this.

[9] The minutes of the September 2 meeting are not in the record. But the parties agree that the minutes of the August 5 meeting were approved at the Board's September 2 meeting.

7

However, this "documentation," *i.e.*, the Document, was not included in the

minutes.[10]

---

[10] The minutes of the August 5, Board meeting contain the following regarding Verizon's permit application, which was filed and processed in the name of the property owner, Sarah Deck:

> The Regular Meeting of the Oconee County Board of Commissioners was held on Tuesday, August 5, 2014, at 7:00 p.m. in Courtroom No. 1 at the Oconee County Courthouse. . . .
>
> ***Special Use Request No. 6559 - Deck:*** The Board held a public hearing on Special Use Request No. 6559 by Sarah Deck, ±42.38 acres, located on McRees Mill Road, to allow for a telecommunication tower.
>
> Planner Brad Callender presented the staff report on Special Use Request No. 6559.
>
> Attorney Jennifer Blackburn, representing Verizon Wireless, briefed the Board on the request. She stated that Verizon Wireless was seeking to enhance their service area by constructing the telecommunication tower. She referenced a high number of dropped calls in the area. Ms. Blackburn then reviewed the line of site of the telecommunication tower from McRees Mill Road and local subdivisions.
>
> Ken Beall spoke on behalf of the applicant. He stated that he had been requested to prepare a site analysis and in his opinion, the telecommunication tower would not be visible from surrounding properties.
>
> Andy Hawkins spoke in opposition stating he did not understand how the telecommunication tower would not be visible from surrounding properties and urged the Board to follow the Planning Commission recommendation to deny the request. Mr. Hawkins had no coverage issues with his Verizon cell service.
>
> Tali Stone did not feel that the telecommunication tower was needed by those that actually live in the area and requested that the Special Use Request be denied by the Board.
>
> Anne Elizabeth Schildwachter stated that she has excellent cell phone reception in this area and feels that a telecommunication tower will adversely affect adjacent property values and views.
>
> Kate Sherrill felt that a 199' tower does not belong in a rural setting and questioned who would really be benefiting from the building of the

Verizon again contacted the Clerk and this time requested a copy of the "documentation" referred to in the August 5 minutes. The Clerk told Verizon that it would have to file a formal Open Records Request pursuant to the Georgia Open Records Act, O.C.G.A. § 50-18-71, to receive a copy, as it did not own the property affected by the decision.[11] Verizon submitted the Open Records Request on September 5, and on September 10 received a copy of the Document.

B.

---

telecommunication tower. She urged the Board to deny the request as she felt that approval could set a precedent for the future.

Bill Fox agreed with other speakers regarding the denial of the request and the adequacy of the current Verizon cell phone service in the area.

Attorney Jenifer Blackburn stated that she could provide maps and detailed analysis of the need for the tower in the area.

There being no further public comment, the public hearing was closed.

Discussion followed regarding the potential visibility of the proposed tower from surrounding properties.

Commissioner Luke moved to deny Special Use Request No. 6559 by Sarah Deck, ±42.38 acres, located on McRees Mill Road, to allow for a telecommunication tower. Commissioner Saxon seconded. Commissioners Luke and Saxon voted yes. Commissioner Daniell voted no. The motion passed. *See Documentation in Ordinances and Resolutions Book No. 20.*

` The reference to Book 20 pertains to an event that took place after the August 5 meeting adjourned, and after the Board's Chairman reviewed the minutes, approved the composition of the Document, and had the Clerk place it in Book 20. Nothing in the transcription of the August 5 meeting indicates that this event would take place following the meeting.

[11] It is undisputed that Verizon had not yet acquired an interest in the property at the time of the application, though it had authorization from the property owner to file the application affecting her parcel.

9

Verizon filed this action on September 24, 2014.  In its answer to Verizon's complaint, the County asserted that the complaint was untimely.  The County argued that the relevant "final action" triggering the thirty-day limitations period occurred when the Board executed the Document on August 5.  Thus, according to the County, Verizon's suit, filed fifty days later, was time-barred.

Verizon responded that the County had misidentified the Board's "final action."  The final action occurred when it received notice that the Board's written decision was available.  Verizon was not alerted to the existence of the Document until it read the minutes of the August 5 Board meeting, which the Board approved on September 2.  Verizon did not receive a copy of the Document until September 10, in response to its September 5 Open Records Request.  Accordingly, a "final action" triggering the thirty-day limitations period could not have occurred before September 2, at the earliest.  Its lawsuit, Verizon argued, was thus timely.

The District Court was not persuaded.  According to the Court, the "final action" occurred when the Clerk placed the Document in Book 20 on August 7, 2014.[12]  The Court therefore concluded that the thirty-day limitations period

---

[12] The District Court also noted the placement of a copy of the Document in the planning department files the day before, perhaps implying that such placement operated as the "final action."  Apparently considering the issue more favorably to Verizon, the Court decided that the limitations period ran from the Clerk's placement of the Document in Book 20 on August 7.

expired before Verizon filed this action on September 24,[13] and that Verizon's

lawsuit was therefore untimely.[14]

## II.

In granting entities such as Verizon the statutory right to judicial review of a

local government's "final action" regarding their applications, Congress created a

property right, a cause of action, protected by the due process clause of the

Fourteenth Amendment. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429,

102 S. Ct. 1148, 1154 (1982) ("[A] cause of action is a species of property

protected by the Fourteenth Amendment's Due Process Clause.") (citing *Mullane*

*v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 70 S. Ct. 652 (1950)).

Here, Verizon's right to challenge the Board's denial of its permit

application would materialize once two events occurred: first, the Board had to

"issue" a written decision memorializing the vote it took at its August 5, 2014,

monthly meeting; second, that decision had to become a "final action" under the

TCA.[15]  Verizon could not exercise its right without notice of these two events.

---

[13] The thirty-day clock therefore also expired, in the District Court's view, before Verizon could obtain a copy of the Document on September 10, 2014, two weeks before filing suit.

[14] Verizon moved to alter or amend the District Court's judgment on February 13, 2015. The Court denied the motion, relying essentially on the reasoning of its order dismissing Verizon's lawsuit.

[15] Under Supreme Court and Eleventh Circuit precedent, localities must "issue" a *written final decision* with contemporaneous reasons *sufficient to permit an informed decision to pursue*

11

Concordantly, the County's procedures could not hinder Verizon's acquisition of such notice, because that would obstruct the TCA's judicial review scheme. *Cf. Roswell*, 574 U.S. at __, 135 S. Ct. at 815 (observing that "*a locality cannot stymie or burden the judicial review contemplated by the statute* by delaying the release of its reasons for a substantial time after it conveys its written denial" (emphasis added)).

The District Court was cognizant of Verizon's need for notice of when these two events occurred. The Court thus looked to the TCA to see what it required the Board to do after voting to deny Verizon's application at the August 5, 2014 meeting. It found the TCA silent on the point.

> Nowhere does the Act state that denial must be mailed, distributed, or posted in some manner designed to provide actual notice to the aggrieved party. Indeed, the United States Supreme Court recently emphasized that the Act "does not use any verb at all to describe the conveying of information from a locality to an applicant; it just says that a denial 'shall be in writing and supported by substantial evidence contained in a written record.'"

Order at 6–7 (quoting *Roswell*, 574 U.S. at __, 135 S. Ct. at 818 (quoting 47 U.S.C. § 332(c)(7)(B)(iii))).

> Although public policy considerations could support a requirement that the aggrieved party receive *actual* notice of the permit denial, Congress did not adopt such a policy. . . . Congress simply instructed localities to memorialize their final actions in writing. "Putting the

---

*judicial review within thirty days*. *See Preferred Sites, LLC v. Troup Cty.*, 296 F.3d 1210, 1217 (11th Cir. 2002); *T-Mobile S., LLC v. City of Roswell*, 574 U.S. __, 135 S. Ct. 808, 817 (2015).

decision in writing is the last action the authority is statutorily required to take."

*Id.* at 7, (quoting *Preferred Sites*, 296 F. 3d at 1217).[16]

While Congress did not explicitly instruct local governments to provide aggrieved parties with "actual notice" of the issuance of their final permitting decisions and where the decisions might be found, it could not have intended that aggrieved parties receive no notice at all, because that would effectively deprive the parties of their right to judicial review under 47 U.S.C. § 332(c)(7)(B)(v). *See Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566 (2009) (refusing to accept a statutory interpretation "at odds with one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (internal quotation marks omitted); *Roswell*, 574 U.S. at __, 135 S. Ct. at 815. Constructive notice though could, at least in theory, provide aggrieved parties notice sufficient to satisfy due process. For example, state law and/or a local ordinance could inform applicants and the public where in the local

---

[16] The District Court later continued:

The Court acknowledges that Verizon's argument for more notice may be supported by sound policy considerations; but the Act simply does not require it. Adoption of Verizon's position would require the Court to re-write the Act. If the appellate courts wish to engage in such judicial mischief, so be it. This Court has a duty to remain faithful to the plain language of the Act, and consistent with that duty, the Court must dismiss the Complaint as untimely.

Order at 10–11.

13

government's official records permitting decisions could be found and readily accessed.[17] *See Grayden v. Rhodes*, 345 F.3d 1225, 1239 (11th Cir. 2003) (observing that for over "one hundred years" the Supreme Court "has declared that a publicly available statute" suffices to provide a party notice of his right to seek review of an adverse decision, because "individuals are presumptively charged with knowledge of such a statute").

The District Court searched for an Oconee County ordinance that would have provided Verizon with that information. Its search came up empty. "[N]o local ordinance informs an applicant how to obtain a copy of the Board's written decision." Order at 2. The Court nonetheless concluded that such an ordinance was not needed to satisfy due process. Rather, it reasoned, the County's custom of having the Clerk place the Board's written decisions in its Ordinances and Resolutions books, which were open to the public, provided Verizon with all the process it was due. As the Court expressed it,

> [T]he Board's written decisions [are contained] in a series of books stored in the clerk's office. As a public record, the written decision is available to the public on request. If a request is made by a party that does not own the property that is the subject of the decision, the

---

[17] State recording statutes, for example, both establish a registry of deeds and virtually obligate purchasers of real estate to examine the chain of title to a parcel to ensure that their purchase will be effective against all comers. *E.g.*, *Lynch v. Murphy*, 161 U.S. 247, 253, 16 S. Ct. 523, 535–36, (1896). Likewise, rules of civil procedure require the clerk of court to maintain a public docket and litigants in a pending lawsuit to keep themselves apprised of when judgment is formally entered. Fed. R. Civ. P. 58, 77(d)(2); Fed. R. App. P. 4(a).

14

clerk's practice is to require an open records request before delivering the decision. . . .

[I]f Verizon simply had asked the clerk's office if the Board had reduced its decision to writing, it would have been told yes. And if Verizon had further inquired into how it could receive a copy of that decision, the clerk's office would have explained the record book and zoning department procedures. Instead of just asking the clerk for the written decision, Verizon waited for the Board to approve the [August 5] meeting minutes [at its next monthly meeting, on September 2].

*Id.* at 2–3, 6–7.[18]

The District Court thus found the Board's approval of the August 5 minutes at its September 2 meeting unnecessary to render the Board's written decision to deny Verizon's permit application *final*. According to the Court, the decision became final under the TCA when the Clerk placed it in Book 20; provided, however, that "diligence" on Verizon's part would have led it to the decision. The decision here became final, the Court reasoned, because Verizon could have discovered it through a diligent inquiry. But Verizon was not diligent, according to the Court. "[I]nstead of diligently seeking *alternative access* to the written decision, which may have led Verizon to the clerk's record books or the zoning

---

[18] The District Court found that the way in which the Board's written decision was handled "followed [the County's] customary procedure," Order at 3, and that such procedure satisf[ied] procedural due process," *Id.* at 7 n.1. "The County . . . reduced its decision to writing, as required by the [TCA], and placed that writing in the County's public records which were reasonably available to members of the public, including Verizon." *Id.* "Nothing in the [TCA] suggests that what the County did here—filing the written decision in the County record book and zoning department files where it was available for public review—ran afoul of the Act." *Id.* at 6–7.

department files, Verizon focused on the meeting minutes.  This was a mistake."[19]

*Id.* at 4 (emphasis added).   "Although Verizon's predicament could have been

avoided had the County simply mailed a copy of the written denial to Verizon's

counsel, the Court is unpersuaded that Verizon did all that it could do."  *Id.* at 10.

In sum, according to the District Court, finality in this case turned on

Verizon's lack of diligence; Verizon failed to do all that it could do to learn of the

written decision and find out where to obtain it.  Therefore, the placement of the

Document in Book 20 constituted the Board's "final action" for TCA litigation

purposes.  While Verizon was awaiting the approval of the minutes of the August 5

meeting, the thirty-day limitations clock was running.[20]  By the time it asked the

Clerk for a copy of the Document on September 5, 2014, the clock had expired.

### III.

The TCA provides no express answer to the question of when a local

government's permitting decision becomes a "final action," which starts the thirty-

day clock.  *See* 47 U.S.C. § 332(c)(7); *Roswell*, 574 U.S. at __, 135 S. Ct. at 817–

---

[19] The Court's opinion does not explain the meaning of "alternative access."  Alternative to what?

[20] The District Court thus made the approval of the minutes irrelevant; under its reasoning, the minutes are of no use to an applicant who wishes to vindicate his statutory right to judicial review within the appropriate period.  The minutes do not get approved until the next regular monthly Board meeting.  Thus, it would often be the case that the thirty-day limitations period would run out before the Board approved the minutes of the prior monthly meeting (in which the permit application was voted down).  This is not to mention the time it might take a county to provide access to the approved minutes, or for an applicant to obtain them and to file suit.  The minutes would therefore be, under the District Court's analysis, of no help to an applicant who wishes to timely file suit.

16

18. The District Court therefore looked to local law, the ordinances and the procedures governing the disposition of the Board's zoning decisions, for the answer. Because the County lacks an ordinance that "informs an applicant how to obtain a copy of the Board's written decision," the Court consulted the County's "customary procedure" of recording zoning decisions in the Ordinances and Resolutions books for guidance.[21] Order at 2. It decided that when a zoning decision is reduced to writing and placed in those books it becomes final. *See id.* at 8. In doing so, the Court decided a question of law, the legal effect of the written decision.

The Court erred in concluding that the placement of the Document in Book 20 automatically transformed the Board's denial of Verizon's permit application at its August 5 meeting into a "final action," such that Verizon's inchoate right to sue instantaneously ripened. Had the Court consulted Georgia law and the County Code, it would have concluded that the Board's denial of Verizon's application became final when the Board approved the minutes of its August 5 meeting on September 2.

The Board arrives at its zoning decisions according to the rules set out in the County Code.[22] In turn, the County Code was "adopted pursuant to the authority conferred by the Georgia Constitution [and] the authority and requirements of

---

[21] The record indicates that this customary procedure had been in place since 1986.
[22] *Available at* http://oconeecounty.com/368/Unified-Development-Code.

17

Georgia Zoning Procedures Law and other applicable State laws and requirements."  County Code § 102.02 (citation omitted).

In conformance with Georgia's "Open Meetings Act," the Board had to prepare a written "summary of the subjects acted on" at its August 5 meeting[23] and make it "available to the public for inspection within two business days of the adjournment of [that] meeting."  O.C.G.A. § 50-14-1(e)(2)(A).  Minutes of the meeting had to be prepared and "promptly recorded."  *Id.* § 50-14-1(e)(2)(B).  The Board was then to vote on whether to approve those minutes at its "next regular meeting," *i.e.*, on September 2.  Once approved, the minutes must be made "*open to public inspection*, but in no case later than immediately following [the Board's] next regular meeting."  *Id.* (emphasis added).[24]  An action must comply with these requirements in order to be legally operative in Georgia.[25]  *See* O.C.G.A. § 50-14-

---

[23] Prior to the meeting, as mandated by the Open Meetings Act, the Board made "available an agenda of all matters expected to come before [it] at such meeting."  O.C.G.A. § 50-14-1(e)(1).  The agenda was made "available upon request and [was] posted at the meeting site."  *Id.*

[24] For example, the Clerk told Verizon that the minutes "will be posted on the [County] website once they are approved."  The County generally posts the minutes and agendas for Board of Commissioners' meetings on its website.  *See Oconee Cty. Agenda Center*, http://oconeecounty.com/AgendaCenter.

[25] Surely, if an action is not legally operative until the minutes are approved *under Georgia law*, that action cannot be "final" under the TCA, thus starting the thirty-day clock, until the minutes are approved.  Also note here that the Supreme Court has held that minutes constitute an "acceptable form" of "written record" evidencing a locality's decision and reasoning under the TCA.  *Roswell*, 574 U.S. at __, 135 S. Ct. at 818.

It is also useful to note the multiple ways in which the Open Meetings Act is enforced.  "[A]ny person, firm, corporation, or other entity" may initiate an action in the Georgia superior courts to enforce compliance or invalidate an action taken unlawfully.  *See* O.C.G.A. § 50-14-

1(b) (providing that all votes "shall be taken in . . . compliance with the posting and agenda requirements"); *Schoen v. Cherokee Cty.*, 530 S.E. 2d 226, 226–27, 242 Ga. App. 501, 501 (2000) ("[A]*ny* actions taken during a meeting held in violation of the [Open Meetings] Act are not binding." (emphasis added)).

The Board had plenary power over the August 5 minutes: it could approve the minutes, revise them, or postpone its approval decision until the next month's meeting in October.[26]  As it turned out, the Board approved the August 5 minutes in full.  The minutes were placed on its website, which Verizon accessed.

IV.

We conclude that the Board's August 5 decision became "final" for purposes of the TCA on September 2, when the Board approved the minutes of the August 5 meeting.  We do so for several reasons.

First, the Open Records Act provided Verizon with constructive notice as to when the Board's August 5 decision to deny its permit application would become

---

5(a).  The state Attorney General also may bring such a civil enforcement action.  *Id.*  Finally, the Attorney General or district attorney may file a *criminal* action to prosecute "any person knowingly and willfully conducting or participating in a meeting in violation of this chapter." *See id.* § 50-14-6; *see also* Ass'n of Cty. Comm'rs of Ga., *Georgia's Open Meetings and Open Records Laws: A Guide for County Officials* 23 (6th ed. 2013) (using, as an example of "a meeting that did not meet the requirements of the open meetings law," a meeting "where an agenda, summary, or minutes were not prepared or released in a timely manner").

[26] The exercise of such powers on the part of localities should be expected under the TCA, a statute intended to "preserve[] the authority of State and local governments over zoning and land use matters except in the limited circumstances" specified in the Act.  *See* H.R. Conf. Rep. No. 104–458, p. 207–08 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 222–23; *Abrams*, 544 U.S. at 128–29, 115 S. Ct. at 1462–63.

"final." The Act informed Verizon that the decision would become final if the Board approved the minutes of the August 5 meeting at its next monthly meeting, on September 2.[27] Once the minutes were approved, the decision would become "official" and had to be "promptly recorded." On the other hand, neither Georgia law nor any County ordinance put Verizon on constructive notice that the decision would become final when the Clerk placed the Document in the Book 20—or that such a document would be created or that such a book even existed.[28]

Second, if the District Court is nevertheless correct that the placement of the Document in Book 20 constituted the Board's "final action" on Verizon's application, then the Open Records Act provisions requiring the approval of that decision so that it could become "official" and "recorded" are mere surplusage. Those affected by the Board's zoning decisions, including the public, who believe that a zoning decision reached at a regular monthly Board meeting is not final and legally effective until the Board approves it at its next monthly meeting, would be surprised to learn they were mistaken. Considering the permitting process, the

---

[27] Or a later meeting if the approval decision was deferred.

[28] Instead, as set out above, the County relied on its own local custom. But we also note here that Verizon disputes whether the practices the County employed here actually align with custom. Verizon employed a consultant claiming decades of experience with Oconee County zoning proceedings. That consultant averred in his affidavit that the County's procedures for rendering written decisions are unclear and constantly vary.

20

TCA, the policies behind it, and the relevant background law, one cannot conclude that the Document's placement in Book 20[29] embodied the County's "final action."

Third, the Clerk posted draft minutes of the August 5 meeting on the County's website, in accordance with the Open Records Act. *Draft* minutes (as the Clerk herself referred to them) are, by definition, subject to revision.[30] When the Clerk posted the draft of the minutes of the August 5 meeting on the County's website, she was notifying those affected by the permitting decision that they could appear at the September 2 meeting and speak to the question of whether that decision should be made final via the approval of the minutes of the August 5 meeting.[31] The draft minutes' publication thus provided notice that the action the

---

[29] Nor did the placement of a copy of it in the planning department files.

[30] Nothing obligated the Board to approve the portions of the minutes that referenced the Document and laid out the reasons for denying Verizon's request. It necessarily follows that the "decision" placed in Book 20 could not constitute a "final action" under the TCA until the minutes' approval. *See Helcher v. Dearborn Cty.*, 500 F. Supp. 2d 1100, 1109 (S.D. Ind. 2007) (stating that minutes subject to revision do not represent a "final action" under the TCA, and thus the thirty-day window began to run only after minutes were "finalized—that is, when the minutes were approved").

[31] The purpose of online *publication* here is not simply to inform interested parties of what occurred at the last meeting. It is also to notify interested parties of what is *to be finalized* at the next meeting in order that they may appear and have their objections heard before the decision becomes final.

The *Helcher* Court understood this, and the facts of that case further illustrate it. There, the Board voted to deny an application for approval of cellular tower construction under the TCA at a Board meeting on March 14, 2006. *Helcher*, 500 F. Supp. 2d at 1107. At the Board's May 9 meeting, some Board members as well as the Plaintiffs disputed the minutes and suggested numerous revisions. *Id.* The Board therefore voted to table the March 14 minutes until the next meeting, which occurred on June 13. *Id.* Four days before that meeting, on June 9, the Plaintiffs submitted a letter to the Board requesting that it not approve the *since revised* minutes of the March 14 meeting, and *reconsider its decision to deny* their permit application. *Id.* At the June 13 meeting, the Board approved the minutes *as revised* and refused to reconsider the denial. *Id.*

Board took at that meeting would not be final until approved, presumably at the September 2 Board meeting. Moreover, the draft minutes contained the reference, "*See Documentation in Ordinances and Resolutions Book No. 20*." (emphasis in original). Anyone who had attended the August 5 Board meeting, or read the transcript of what transpired there, would realize that the reference pertained to something extraneous to the meeting and would assume that if the minutes of the meeting were approved, a document reflecting the Board's permitting decision would be placed in Book 20.[32]

---

Plaintiffs brought suit in federal court on July 12. *Id.* Obviously, the minutes were not final until approved.

The Court recognized that commonsense conclusion and held, first, that "the Board's minutes constituted a written record as contemplated by the [TCA]" and, more importantly, that "the [TCA's] thirty-day window did not begin to run until after that decision was *finalized*—that is, when the minutes were approved." *Id.* at 1110 (emphasis added). The Court continued: "the conflict over the accuracy of the minutes which delayed the Board's approval thereof serves as strong evidence that the Board's *final* action was not rendered until" the minutes were approved. *Id.* (emphasis in original).

[32] The placement of the Document in Book 20 was not part of the action taken at the August 5 meeting. First, the transcript of what transpired at the meeting contains nothing to indicate that after the meeting adjourned, the Board would create a document memorializing its vote and place it in the County's Ordinances and Resolutions books. Second, the draft of the meeting's minutes, which were posted in advance of the September 2 meeting, cited the Document but did not reveal its precise contents. The contents could not be known without examining the Document after the minutes of the August 5 meeting had been approved and posted on the County's website. Third, the Document could not be placed in the Ordinances and Resolutions books until the Board chairman examined the document and approved it. That occurred after the August 5 meeting had adjourned, arguably in violation of the Open Meetings Act. We make these observations in passing, since they were not presented to the District Court or in the parties' briefs in this appeal.

22

Fourth, under the District Court's approach, the finality of the Board's decision turns on Verizon's "diligence." Verizon should have disregarded the approval scheme prescribed by the Open Records Act and asked the Clerk the right questions. If Verizon's lawyer had been diligent, she would have asked the right question, and the Clerk would have told her where she could find the Document—by making an Open Records Act request. Verizon's lawyer was instead looking for the minutes of the Board's August 5 meeting, and the Clerk had to have known why: so that Verizon could challenge the Board's permitting decision in court.

According to the District Court Verizon, rather than relying on minutes approved pursuant to law, should have "diligently" sought the Document—which was placed in records according to customs and practices *nowhere* established by law or memorialized for public access. Congress did not contemplate this scenario in enacting the TCA. It did not intend the right to challenge a local permitting decision to depend on whether the applicant's lawyer was "diligent." To uphold this interpretation would be to accept an unreasonable reading of the TCA that would yield unjust and even absurd results.[33] It would impose a duty on applicants

---

[33] The District Court implies that to enable the TCA's vital judicial review scheme, all the Act requires of localities by calling for a final written decision is that localities place that decision where an applicant can find it via "diligent[]" or "reasonable" inquiry. *See Roswell*, 574 U.S. at __, 135 S. Ct. at 815 (noting the importance of the TCA's judicial review scheme); *Abrams*, 554 U.S. at 127–28, 125 S. Ct. at 1462–63 (same). But suppose, for example, Verizon had gone to the planning department to obtain the decision. Would the thirty days run from when the planning department received it from the Clerk? That could have been days after the Clerk placed it in Book 20 (here, it was the day before). Would it run from the moment the

to know the obscure and byzantine "customs" of every local government office whose approval they need, and which are nowhere established by law. This, Congress could not have intended. *See Durr v. Shineski*, 638 F.3d 1342, 1349 (11th Cir. 2011).

Especially not where Congress aimed to "reduc[e] impediments imposed by local governments" to the provision of wireless services by, among other things, providing applicants the right to federal judicial review of local decisions "on an expedited basis." *Abrams*, 554 U.S. at 115, 123, 125 S. Ct. at 1455, 1459; *see* 47 U.S.C. § 332 (c)(7)(B)(v). The District Court's reading would thwart the expedience and efficiency of the TCA's judicial review scheme, impairing the enforcement of the Act's substantive standards of fairness, and thus obstructing its overall goal to "encourage the rapid deployment of new telecommunications technologies." *Abrams*, 544 U.S. at 115, 125 S. Ct. at 1455.

Finally, we must reject the District Court's reading as inconsistent not only with the goals of the TCA, principles of statutory interpretation, and due process, but also with Supreme Court precedent. In *Roswell*, the Supreme Court defined "final action" under the TCA as "the issuance of the written *notice* of denial." 574 U.S. at __, 135 S. Ct. at 817 n.4 (emphasis added). This language clearly signifies

---

document was placed in the department files? What about when the Board first reduced the decision to writing? The moment the Clerk forwarded the decision to the planning department?

that the Court understands the TCA to require "notice."  Moreover, and tellingly, when the Supreme Court defined "final action" to include notice, it cited its own elucidation of administrative law in *Bennett v. Spear*, where the Court held that "two conditions must be satisfied for agency action to become final: First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative . . . nature [a]nd second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *See id.* (*citing Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S. Ct. 1154, 1168 (1997) (internal citations and quotation marks omitted)).  As explained above, here the Board's "decisionmaking process" was not consummated, and the relevant legal consequences under the TCA did not flow, until the Board approved the minutes of the meeting at which the vote was taken.

For all these reasons, the Board's action became final not when the Clerk placed the Document in Book 20, as the District Court found, but when the Board approved the minutes of the meeting at which it voted on Verizon's application.

## V.

Congress *must* have intended that localities provide notice sufficient to allow applicants such as Verizon to vindicate their rights.  Otherwise, the TCA's judicial review provisions, and the substantive rights they exist to protect, would be meaningless.  Only when an applicant receives sufficient notice does the decision

25

become "final," and only then can the thirty-day clock begin to run.  Congress, which "is presumed to act with sensible and reasonable purpose," *In re Graupner*, 537 F.3d 1295, 1302 (11th Cir. 2008), enacted the TCA taking it as given that localities issue their written decisions in a way reasonably calculated to provide notice sufficient under the due process clause, *see Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108, 111 S. Ct. 2166, 2169 (1991); *Mullane*, 339 U.S. at 319, 70 S. Ct. at 660.

The minutes, created pursuant to published statute, provided the notice that due process and the Supreme Court's interpretation of the TCA requires.  Their approval, pursuant to the same statute, provided the finality the TCA mandates. The only possible "written notice of denial" constituting Oconee County's "final action," and thus triggering the thirty-day clock, occurred when the Board approved the minutes of the August 5, 2014 meeting, on September 2.  Verizon's action, filed on September 24, was therefore timely.  Accordingly, the District Court erred in dismissing Verizon's case.

The judgment of the District Court is **REVERSED.**  The cause is **REMANDED** for a determination of the merits of Verizon's challenge to the Board's permitting decision.

**SO ORDERED.**

26

KAPLAN, District Judge, joined as to Part II.A by ROSENBAUM, Circuit Judge, concurring:

This is an action by Athens Cellular, Inc., d/b/a Verizon Wireless ("Verizon"), against Oconee County, Georgia ("Oconee County" or the "County"), the Oconee County Board of Commissioners (the "Board"), and the chairman and individual members of the Board for judicial review of the Board's denial of Verizon's application for a special use permit to build a cellular communications tower. Verizon appeals from the district court's dismissal of the action as untimely. I concur in the majority's conclusion that the dismissal was erroneous. With great respect for my colleagues, however, I do so on a different basis.

## I. FACTS

This litigation arises in the context of the Telecommunications Act of 1996 (the "TCA"), which, in relevant part, limits the power of state and local governments to interfere with the siting of personal wireless service facilities in the national interest of promoting and maintaining high quality telecommunications services. It is useful to begin with some general background on the TCA.

### A.    The Telecommunications Act of 1996

The TCA "was intended 'to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new

27

telecommunications technologies.'" *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1214 (11th Cir. 2002) (quoting Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56, 56).

The TCA was designed to maintain state and local authority over the construction and regulation of personal wireless service facilities, subject to certain limitations. *See* 47 U.S.C. § 332(c)(7)(A). As we have stated previously:

> "With respect to the construction of telecommunications facilities, Congress recognized zoning decisions by state and local governments had created an inconsistent array of requirements, which inhibited both the deployment of personal communications services and the rebuilding of a digital technology-based cellular telecommunications network. H.R. Rep. No. 104-204, at 94 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61. Despite this recognition, Congress also acknowledged 'there are legitimate State and local concerns involved in regulating the siting of such facilities . . ., such as aesthetic values and the costs associated with the use and maintenance of public rights-of-way.' *Id.* at 94-95, *reprinted in* 1996 U.S.C.C.A.N. 10, 61. As a result, Congress enacted § 704(a) to 'preserve[ ] the authority of State and local governments over zoning and land use matters except in . . . limited circumstances. . . .' H.R. Conf. Rep. No. 104-458 (1996), at 207-08, *reprinted in* 1996 U.S.C.C.A.N. 124, 222."

*Preferred Sites, LLC*, 296 F.3d at 1214.

The limitations on state and local governments are both substantive and procedural in nature and are set forth in Section 704(a) of the TCA, codified at 47 U.S.C. § 322(c)(7)(B).

The TCA provides that a state or local government or instrumentality, in regulating personal wireless service facilities, "shall not unreasonably discriminate among providers of functionally equivalent services" or "prohibit or have the effect

28

of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i). It directs the state or local government or instrumentality to act on requests to construct such facilities "within a reasonable period of time after the request is duly filed" and provides that any decision by such government or instrumentality must "be in writing and supported by substantial evidence contained in a written record." § 332(c)(7)(B)(ii)-(iii).[1]

The final limitation on state and local governments is the provision of a right of federal judicial review. This provision, which is at the root of the dispute before us, states:

> "Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief."

§ 332(c)(7)(B)(v).

### B.    Proceedings Below

#### 1. The Complaint

---

[1] In addition, the TCA prohibits a state or local government or instrumentality from "regulat[ing] the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [Federal Communications Commission's] regulations concerning such emissions." § 332(c)(7)(B)(iv).

Verizon filed a complaint against the County, the Board and the Board members for declaratory and injunctive relief on September 24, 2014 alleging the following facts.

Verizon, as a commercial mobile services and telecommunications provider in and around Oconee County, had discovered a "significant gap" in its personal wireless service network in the County and launched a search for a site on which to construct a cellular communications tower to fill that gap. It had determined that a plot located at 1210 McRees Mill Road "would meet its coverage service needs, comply with the County's Unified Development Code [(the "County Code")], and respect the character of the neighborhood."

The County Code requires any property owner who wishes to construct a personal wireless service facility on their property to "obtain[] special use approval from the Board of Commissioners in accordance with the procedures set forth for special use approval in this Development Code." Oconee County Unified Development Code § 333.04(a). Verizon therefore submitted an application on May 30, 2014 for a special use permit to construct a 199-foot cellular communications tower on the McRees Mill Road property.[2]

---

[2] The property was owned by Sarah Deck. A third-party may submit an application for a special use permit in respect of someone else's property if the owner of the property authorizes the third party in writing to "represent and act on behalf of the owner." Oconee County Unified Development Code § 1206.02(b). Ms. Deck authorized Verizon to submit the application at issue in this case.

30

The staff of the Oconee County Planning Department ("Planning Department") reviewed the application, found that the proposed tower met the requirements of the County Code, and issued a report recommending that the application be approved subject to certain conditions.  The Oconee County Planning Commission ("Planning Commission") then held a public hearing on July 21, 2014.  Several members of the public argued against approval of the tower on the basis that it would not be aesthetically pleasing and that it would diminish property values.  At the conclusion of the hearing, the Planning Commission recommended that the Board deny the application.[3]

The Board considered Verizon's application during its regular monthly meeting on August 5, 2014.  It too heard from a number of individual residents, each of whom spoke in opposition to the construction of the tower.  It then voted to deny the application without providing a rationale for its decision.

The Board adopted the meeting minutes of the August 5, 2014 meeting during the Board's September 2, 2014 meeting.

The complaint alleged that the Board's denial of its application for a special use permit violated the TCA because it was not supported by substantial evidence

---

[3] Before the Board takes final action on a proposed zoning change, the application must be submitted to the Planning Commission.  The staff of the Planning Department reviews the application initially and prepares a report recommending that the application be either approved or denied.  The Planning Commission then conducts a public hearing and makes a recommendation to the Board.  *Id.* §§ 1208-1208.02.

31

contained in the written record, as required by Section 332(c)(7)(B)(iii), and because it had the effect of prohibiting access to personal wireless services in violation of Section 332(c)(7)(B)(i)(II).   It sought an injunction directing defendants to approve any necessary permits to allow Verizon to construct its desired cellular communications tower.

The complaint alleged also that the action was timely pursuant to Section 332(c)(7)(B)(v) because it had been commenced within 30 days of the Board's "final action," which Verizon claimed had occurred on September 2, 2014 with the Board's adoption of the minutes of the August 5, 2014 meeting.

### 2.   Additional Briefing and Fact-Gathering on Timeliness

Defendants' answer asserted that the Board had issued a final written decision on August 5, 2014.  Accordingly, it sought dismissal of the action as untimely because it had not been filed within 30 days of that date.

Verizon responded that defendants had "incorrectly identified the 'final action' that trigger[ed] the 30-day window" as having occurred on August 5, 2014. The statute of limitations had not begun to run, Verizon maintained, until September 2, 2014, when the Board approved the minutes of the August 5, 2014 meeting.

During oral argument, the district court invited the parties to supplement the record and submit short briefs to resolve the outstanding issue of timeliness.[4]

Verizon responded with a supplemental brief as well as affidavits and accompanying exhibits from its outside counsel, Jennifer A. Blackburn, and from a local landscape architect with whom Verizon had consulted in preparing its application for a special use permit, Kenneth A. Beall.  Defendants also submitted a supplemental brief and an affidavit of the Oconee County Clerk, Jane Greathouse.  These submissions brought out the following facts.

On August 5, 2014, following the meeting during which the Board considered and voted to deny Verizon's application for a special use permit, the four members of the Board who had attended the meeting[5] signed a one-sentence document, entitled "Action Denying Special Use Approval Request," which memorialized the Board's denial of Verizon's application (the "Action").  The

---

[4] The district court heard oral argument as to Verizon's claim that the Board's denial of its application was not supported by substantial evidence in the record, but deferred extensive discovery for the time being, stating that its job was "to determine – based on the record as it existed at the time the decision [by the Board] was made –  . . . whether there is substantial evidence in that record to support the denial."  It reasoned that it could decide at a later time whether the parties should have the opportunity to supplement the record if it needed to reach the question of whether the Board's decision had the effect of prohibiting access to wireless services.

As defendants had moved also to dismiss for lack of standing, the district court invited the parties to supplement the record on that issue as well.  Although the district court did not discuss standing in its order dismissing the complaint, I agree with the majority that the district court necessarily decided that Verizon had constitutional standing to pursue this action.  I agree also with the majority that defendants' motion to dismiss for lack of standing lacks merit substantially for the reasons stated in the majority's opinion.  Op. at 4 n.4.

[5] The chairman of the Board was not present at the meeting on August 5, 2014.

Action was dated August 5, 2014 and stated that "[a]fter consideration and a motion and second, the Oconee County Board of Commissioners does hereby deny the above-referenced request for Special Use Approval." The Board, however, did not provide a copy of the Action to Verizon nor inform Verizon that the Board had reduced its decision to writing. Nor was the Action made available on the County's website. Instead, pursuant to an informal County practice that had begun in 1986, the Action was inserted into a series of books stored in the office of the Oconee County Clerk (the "County Clerk") on August 7, 2014, after the Board chairman had reviewed the document. The County Clerk also forwarded the Action to the Planning Department on August 6, 2014, where it was kept on file.

As a public record, the Action would have been made available to Verizon from the County Clerk upon request. But no local ordinance informed an applicant concerning where or whether a written decision would be prepared nor, if one somehow learned that it would be prepared, how to obtain a copy.

Jennifer Blackburn, Verizon's outside counsel, stated in her affidavit that "[i]n jurisdictions where no written notice of denial is provided, the standard practice is for the applicant to obtain a copy of the official minutes of the Board of Commissioners' meeting for the meeting at which the application was denied."[6] Kenneth Beall, who stated that he had "extensive experience with zoning

---

[6] The Georgia Open Meetings Act provides that the minutes of a meeting become official upon approval by the governing body that convened the meeting. O.C.G.A. § 50-14-1(e)(2)(B).

applications, including Special Use Permit applications and variance applications, before the [Board]," described the procedures by which the Board rendered its written decisions as "unclear, despite [his] 31 years' experience." Mr. Beall added that the Board's decisions were "typically put in writing as a confirmation of the vote that was taken by the Commissioners," but that "the timing [] varied" as to when that was done. He was not aware of decisions having been put into writing on the night of a hearing, but was "aware of decisions being put in writing several days or even weeks after the hearing."

Accordingly, Verizon, anticipating that the minutes would be approved during the next regular meeting of the Board on August 26, 2014, emailed the County Clerk on August 28 to ask whether the Board had approved the minutes for the August 5 meeting and, if not, when the Clerk expected them to be approved. The Clerk responded that the meeting minutes would be approved during the Board's regular meeting on September 2, 2014. On September 5, 2014, Verizon emailed the County Clerk again and asked for a copy of the approved August 5 meeting minutes. It was directed to the website where the minutes had been posted. The approved minutes, in the section describing the Board's consideration of the application and ultimate vote to deny it, referred to a "Documentation" in "Ordinances and Resolutions Book No. 20," though such Documentation had not been appended to the minutes. Accordingly, Verizon emailed the clerk later that

35

day and requested a copy. After opening and approving an Open Records Request,[7] the clerk emailed a copy of the August 5 decision to Verizon on September 10, 2014.

In its supplemental brief, Verizon argued that notice to an applicant is a prerequisite to the taking of a "final action" for purposes of the TCA and, consequently, that the Action could not have constituted the "final action" because Verizon had been given no notice of it until after the Board minutes for the August 5, 2014 meeting had been approved. Verizon asserted also that "the rules for equitable tolling reinforce the requirement that adequate notice is required and if it is not provided a filing deadline should be tolled."

Defendants responded that the Board's act of putting its decision in writing had constituted the "final action" and that equitable tolling neither was warranted in this case nor available under the TCA.

### 3.  The Decision Below

After the parties supplemented the record as described above, the district court dismissed the complaint as untimely without reaching the merits.

The district court declined to read a notice requirement into the TCA because "Congress simply instructed localities to memorialize their final actions in

---

[7] It was the County Clerk's practice, when an applicant other than the property owner requested a decision by the Board, to open and resolve an Open Records Request before providing the applicant with such decision.

writing." It therefore concluded that the written decision executed by the Board on August 5 and available to the public through the County Clerk no later than August 7 constituted its "final action."[8] *Athens Cellular, Inc. v. Oconee County, Georgia*, No. 3:14-cv-87 (CDL), 2015 WL 329217, at *2-3 (M.D. Ga. Jan. 26, 2015).

The court held also that equitable tolling was unwarranted. It stated that Verizon had not done all it could to discover the written denial of its application, reasoning that "[t]he present record indicates that if Verizon simply had asked the clerk's office if the Board had reduced its decision to writing, it would have been told yes." Accordingly, the court concluded, the circumstances were "not sufficiently extraordinary to authorize the application of equitable tolling."[9] *Id.* at *4.

## II. DISCUSSION

The majority reverses the judgment of the district court on the basis that the "final action" did not occur, and the 30-day limitations period did not begin to run, until September 2, 2014 when the Board formally approved the minutes of the August 5, 2014 meeting. I agree with the conclusion that this action was timely, but reach that result on a different basis. In my view, even assuming that the Action signed on August 5, 2014 and inserted into the resolution book on August

---

[8] The district court assumed also that, had Verizon asked, it could have received the decision from the Planning Department as well. *Athens Cellular, Inc.*, 2015 WL 329217, at *1.

[9] The district court subsequently denied Verizon's request that the court alter its judgment.

7, 2014 constituted the Board's "final action" for purposes of the TCA, the dismissal of Verizon's complaint nonetheless was erroneous because the statute of limitations was equitably tolled until September 2, 2014.

### A.     Equitable Tolling

Verizon now argues that the circumstances of this case warrant equitable tolling even if the Board's final action occurred in August 2014.  Defendants argue that equitable tolling is unavailable in this case because the statute of limitations in Section 332(c)(7)(B)(v) is jurisdictional and, in any event, that the circumstances of this case do not warrant equitable tolling.  I consider, first, whether the TCA is subject to equitable tolling and then whether the district court properly declined to apply the doctrine in this case.

### 1.   The TCA Is Subject to Equitable Tolling

Defendants argue that the statutory time period for filing an action under the TCA is not subject to equitable tolling because the time limit is jurisdictional.  I disagree.

When Congress makes a statute of limitations jurisdictional, "a litigant's failure to comply with the [statute of limitations] deprives a court of all authority to hear a case."  *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1631 (2015).  In such cases, a court must enforce the time bar "even if equitable considerations would support extending the prescribed time period."  *Id.*   The statute of

limitations imposed by Congress in the TCA, however, is not a jurisdictional bar. The TCA limitations period therefore is subject to equitable tolling.

"[P]rocedural rules, including time bars, cabin a court's power only if Congress has 'clearly stated[d]' as much." *Id.* at 1632 (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515 (2006))). "'[A]bsent such a clear statement, . . . "courts should treat the restriction as nonjurisdictional."'" *Id.* (quoting *Auburn Reg'l*, 133 S. Ct. at 824 (quoting *Arbaugh*, 546 U.S. at 516)). "[T]raditional tools of statutory construction must plainly show that Congress imbued a procedural bar with jurisdictional consequences." *Id.* "Congress must do something special, beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional and so prohibit a court from tolling it." *Id.*

Section 332(c)(7)(B)(v) states that "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." There is nothing in the plain language of the statute that indicates that Congress intended for the statute of limitations to be jurisdictional. The statute simply speaks to the timeliness of a litigant's claim, not to the jurisdiction of the court. *See Arbaugh*, 546 U.S. at 515. Given the "harsh consequences" of a

different view, *Kwai Fun Wong*, 135 S. Ct. at 1632, I conclude that the statute of limitations imposed in Section 332(c)(7)(B)(v) is not jurisdictional.

Defendants' reliance on *Bowles v. Russell*, 551 U.S. 205 (2007), is misplaced. The Court there considered a time limit on the right to appeal, not a time limit on the filing of an action. To the extent that *Bowles* used broad language to describe when time limitations were jurisdictional, it subsequently has been construed narrowly.

*Bowles* did not hold, as defendants suggest, that "congressionally mandated time limits are jurisdictional." Appellees' Brief, at 36. Although the Court in *Bowles* stated, "the taking of an appeal within the prescribed time is 'mandatory and jurisdictional,'" *Bowles*, 551 U.S. at 209 (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 61 (1982) (*per curiam*)), it in fact held only that the limitation on extensions of time to file an appeal is jurisdictional even in cases where the appellant lacked notice of the entry of judgment under 28 U.S.C. 2107(c). The Court recently stated as much in *Hamer v. Neighborhood Housing Services of Chicago*, 138 S. Ct. 13, 19-22 (2017), where it held that the limitation on extensions of time to file an appeal under Federal Rule of Appellate Procedure 4(a)(5)(C), which applies to cases in addition to those in which the appellant lacked notice of the entry of judgment, was not jurisdictional. The Court there clarified that its holding in *Bowles* was only that "an appeal filing deadline

prescribed *by statute* will be regarded as 'jurisdictional.'" *Id.* at 16 (emphasis added); *see also In re Indu Craft, Inc.*, 749 F.3d 107, 114 (2d Cir. 2014) (distinguishing *Bowles* from an appeal from a district court's final judgment as an appellate body in a bankruptcy case on the basis that the latter was governed by Federal Rule of Appellate Procedure 6(b)(1) and concluding that the limitation on the time to appeal in that case was non-jurisdictional). The Court in *Hamer* stated further that the court of appeal in that case, like several other courts of appeals, had:

> "[T]ripped over our statement in *Bowles* that 'the taking of an appeal within the prescribed time is "mandatory and jurisdictional."' 551 U.S., at 209, 127 S. Ct. 2360 (quoting *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 61, 103 S. Ct. 400, 74 L.Ed.2d 225 (1982) (*per curiam*)). The 'mandatory and jurisdictional' formulation is a characterization left over from days when we were 'less than meticulous' in our use of the term 'jurisdictional.' *Kontrick,* 540 U.S., at 454, 124 S.Ct. 906."

*Hamer*, 138 S. Ct. at 21.

Defendants argue also that the statute of limitations in the TCA should be treated as if it were a limitation on a litigant's time to appeal. They rely on our decision in *Preferred Sites*. *Preferred Sites* indeed did describe Section 332(c)(7)(B)(v) as providing for "an appeal from a 'final action' within 30 days." *Preferred Sites, LLC*, 296 F.3d at 1217. It stated also that "[a]n action filed by an aggrieved party under § 332(c)(7)(B)(v) is similar to an appeal." *Id.* But Section 332(c)(7)(B)(v) states that "[a]ny person adversely affected by any final action . . .

may, within 30 days after such action or failure to act, *commence an action* in any court of competent jurisdiction." (emphasis added). The statute does not say that a person may *appeal* a final action by the state or local government or instrumentality. Taking into consideration the harsh consequences that would follow from holding that the statute of limitations here is jurisdictional, the language in Section 332(c)(7)(B)(v), and the equivocal statement in *Preferred Sites* that an action under Section 332(c)(7)(B)(v) is "*similar to* an appeal," I conclude that the statute of limitations is not jurisdictional and, accordingly, is subject to equitable tolling.

## 2. The Circumstances Warrant Equitable Tolling

Having concluded that equitable tolling is available in this case, I turn to the question whether the circumstances warranted tolling the statute of limitations to September 2, 2014.

"The general test for equitable tolling requires the party seeking tolling to prove '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" *Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 971 (11th Cir. 2016) (quoting *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 755 (2016)); *see also Browning v. AT&T Paradyne*, 120 F.3d 222, 226 (11th Cir. 1997)

42

("[E]quitable tolling does not require any misconduct on the part of the defendant.").

The statute of limitations under Section 332(c)(7)(B)(v) is triggered by a state or local government or instrumentality's "final action."  In this circuit, an action becomes "final" "when the state or local authority issues its written decision."  *Preferred Sites, LLC*, 296 F.3d at 1217.

Nothing in the Georgia Code or the County Code, however, requires the Board to prepare a written decision.  Nor do they disclose or refer to the relevant customs in Oconee County – that is, the signing of a written decision on the day that the Board took the pertinent action and the insertion of such decision into a resolution book in the County Clerk's office.  Thus, the applicable statutory authority gave no notice at all of the procedure that was followed in this case.

Verizon, for its part, produced substantial, undisputed evidence that it understood that the "written decision" constituting the Board's "final action" for purposes of the TCA would be in the meeting minutes of the August 5, 2014 meeting and, therefore, that the 30-day statute of limitations period would begin to run only upon the approval of the meeting minutes.  Its counsel stated that "[i]n jurisdictions where no written notice of denial is provided, the standard practice is for the applicant to obtain a copy of the official minutes of the Board of

43

Commissioners' meeting for the meeting at which the application was denied."[10] In addition, Mr. Beall stated that despite his "extensive experience with zoning applications, including Special Use Permit applications and variance applications, before the [Board]," he was not aware of decisions being put into writing on the night of a hearing.

Based on Verizon's understanding, it emailed the County Clerk and asked for a copy of the official meeting minutes two days after it anticipated that the minutes would have been approved. Upon learning that the minutes in fact would be approved at the following meeting on September 2, 2014, Verizon followed up with the County Clerk three days after that meeting, reviewed the minutes promptly, and asked the Clerk for a copy of the Action to which the meeting minutes referred.

I conclude that Verizon pursued its rights diligently given both the lack of statutory notice of the Action and Verizon's perfectly reasonable, though mistaken, understanding that the official meeting minutes would constitute the "final action" for purposes of the TCA. It took steps within days of the deadlines that it

---

[10] The Georgia Open Meetings Act provides that, "[t]he regular minutes of a meeting subject to this chapter shall be promptly recorded and such records shall be open to public inspection once *approved as official* by the agency or its committee, but in no case later than immediately following its next regular meeting." O.C.G.A. § 50-14-1(e)(2)(B) (emphasis added).

44

anticipated would be relevant and filed this action within 30 days of the date on which it reasonably assumed the statute of limitations would begin to run.

I conclude also that the circumstances were sufficiently extraordinary to warrant tolling in this case. As discussed, Verizon was not on constructive notice by virtue of either Georgia statute or County Code of the County's customary but unpublished procedures for memorializing actions taken during Board meetings. The district court found that "if Verizon simply had asked the clerk's office if the Board had reduced its decision to writing, it would have been told yes," *Athens Cellular, Inc.*, 2015 WL 329217, at *4, which no doubt was true. I conclude, however, that the district court exceeded the bounds of allowable discretion in finding that Verizon had a duty to cross-question the County Clerk in this fashion. Indeed, I can think of few reasons why one might inquire about the official minutes of a meeting other than to get access to an "official" version of any actions taken during that meeting. Thus, it was reasonable for Verizon to anticipate that its question would have elicited information concerning any official actions taken at the meeting about which it inquired. I therefore conclude that the lack of any publicly available trail leading to the resolutions book, coupled with the County Clerk's response to Verizon's inquiry, together were sufficiently extraordinary to warrant equitable tolling.

On this basis, the complaint was timely filed.

45

### B.    The Majority's Rationale

Having concluded that the statute of limitations on Verizon's right to judicial review, assuming it began to run in August 2014, was tolled to and including September 2, 2014, I need not reach the questions decided by the majority. Nonetheless, with great respect for my colleagues, it seems appropriate to indicate why I do not share their conclusion that neither the Action nor the minutes of the August 5, 2014 meeting constituted the Board's "final action" for purposes of the TCA until the minutes of the August 5, 2014 meeting were approved on September 2, 2014.

The majority begins by construing the Georgia Open Meetings Act (the "Act") to require the conclusion that there could not have been a legally operative "final action" until the minutes of the August 5, 2014 meeting were approved on September 2, 2014. Even if that were not the case, it holds, the TCA requires, as a prerequisite to finality, notice to the applicant of the state or local government or instrumentality's action. This is so because (1) it finds a procedural due process right to notice of a state or local government or instrumentality's "final action" under the TCA, (2) it concludes that a different reading of the statute would produce absurd results, and (3) the Supreme Court has held as much. I respectfully do not concur on any of these points.

1.    Georgia Open Meetings Act

46

As an initial matter, I do not agree that the Act compels the conclusion that the Board's decision on Verizon's application did not become final until the minutes were approved on September 2, 2014.

The majority's conclusion depends upon the premise that actions taken by the Board during meetings are not legally operative under Georgia law until the minutes for those meetings have been approved. But that is not what the Act says. Rather, it states that *the minutes* of a Board meeting are not official until they are approved. O.C.G.A. § 50-14-1(e)(2)(B). And that is a matter quite different from stating that *action* duly taken at a Board meeting is not final and binding until the minutes of the meeting are approved. That alone, in my view, is sufficient to conclude that the Act does not justify a conclusion that the Action was not binding until September 2. But there is more.

The Act specifically sets forth one circumstance in which action taken at a meeting "shall not be binding" by reason of a failure to comply with the Act's terms – namely, action taken "at a meeting *which is not open to the public* as required by this chapter." O.C.G.A. § 50-14-1(b)(2) (emphasis added). Thus, the Georgia Legislature considered circumstances in which action taken at meetings would not be binding, specified one such instance, and did not specify the circumstances upon which the majority here relies – the lack of approved minutes until September 2. Under standard principles of statutory construction, the Act in

47

my view is not properly construed to add what the Legislature omitted. *E.g., Allen v. Wright,* 282 Ga. 9, 14, 644 S.E.2d 814, 817-18 (2007) ("[T]he principle of 'expressio unius est exclusio alterius' makes it impossible for the courts to rewrite OCGA § 9–11–9.2 so as to incorporate the missing . . . requirements.") (citations omitted). I therefore am not persuaded that the Act requires the conclusion that the Action taken on August 5, 2014 was not binding until the minutes were approved on September 2, 2014.[11]

### 2. Section 332 Does Not Require Notice of "Final Action"

#### a. The Plain Meaning of the Statute

It is a hallmark of statutory interpretation that we look first to a statute's plain meaning – that is, to the "actual language" used in the statute. *Silva-Hernandez v. U.S. Bureau of Citizenship & Immigration Servs.*, 701 F.3d 356, 363 (11th Cir. 2012); *see also Preferred Sites, LLC*, 296 F.3d at 1216. Moreover, where the actual language is clear, courts are not free to go beyond it. *See, e.g., United States v. Chafin*, 808 F.3d 1263, 1270 (11th Cir. 2015) ("[W]here the

---

[11] Nor am I persuaded by the majority's citation to *Helcher v. Dearborn County*, 500 F. Supp. 2d 1100 (S.D. Ind. 2007), *aff'd*, 595 F.3d 710 (2010). In *Helcher*, the court considered whether the statute of limitations began to run when the county issued its oral decision during a meeting or subsequently when the minutes of that meeting were approved. The court held that the minutes constituted a written decision and thus the county's "final action." Accordingly, the court found that the statute of limitations had not begun to run until the meeting minutes were approved. *Id.* at 1109-10. This case is distinguishable, however, because in *Helcher*, the meeting minutes were the sole written record of the meeting. Here, in contrast, the question is which of two items of documentation constitute the County's "final action," the written record of the action taken at a meeting or the Action memorializing the Board's vote.

statutory language is clear and unambiguous, we presume that Congress said what it meant and meant what it said. Indeed, our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." (internal quotation marks and citations omitted)).

I agree with the majority that it would be desirable for the TCA to provide that an action becomes "final" only upon notification by the acting body to the applicant. But that is not what the TCA says.

Section 332(c)(7)(B)(v) provides no indication that a state or local government or instrumentality is required to provide "notice" of its "final action" to an affected party. Indeed, the TCA explicitly requires notice in its provisions relating to the Secretary of Health and Human Services' enforcement and review power with respect to public entities' compliance with equal opportunity in employment, *see* 47 U.S.C. § 398(b)(5) ("Whenever the Secretary makes a final determination . . . that a recipient is not in compliance with paragraph (1), the Secretary shall, within 10 days after such determination, *notify the recipient* in writing of such determination and request the recipient to secure compliance." (emphasis added)), but does not do so in Section 332(c)(7)(B)(v). Of course, I recognize that Congress's omission of a notice requirement in Section 332(c)(7)(B)(v), while possibly purposeful, conceivably could have been no more than a drafting error. But that is not properly our concern because we are obliged

49

to assume that the statute means what it says and says what it means. *E.g., Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *Chafin*, 808 F.3d at 1270.

### b. Procedural Due Process

The majority asserts that the statutory right to judicial review of a local government's "final action" is a property right protected by the Due Process Clause of the Fourteenth Amendment. Op. at 11 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 429 (1982)). The majority, in consequence, reasons that Congress "could not have intended that aggrieved parties receive no notice at all, because that would effectively deprive the parties of their right to judicial review under 47 U.S.C. § 332(c)(7)(B)(v)." Op. at 13. In substance, then, the majority interpolates a notice requirement that the TCA does not contain on the theory that the TCA would be unconstitutional without it.

"'[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.'" *Northwest Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) (quoting *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984) (*per curiam*)); *see also Clark v. Martinez*, 543 U.S. 371, 381 (2005) (noting that one of the "chief justifications" for the canon of constitutional avoidance is "that it allows courts to

50

*avoid* the decision of constitutional questions") (emphasis in original). To this end, I decline to consider the question of procedural due process because, as discussed above, the judgment in this case may be reached on an alternative basis.

### c. "Absurd Results" Doctrine

The majority reasons also that to find that the Board took its "final action" earlier than September 2, 2014 would yield "unjust and even absurd results" because it "would impose a duty on applicants to know the obscure and byzantine 'customs' of every local government office whose approval they need, and which are nowhere established by law." Op. at 23-24.

It is true that a court may look past the unambiguous language of a statute in exceptional cases when the result otherwise would be "absurd." *Silva-Hernandez*, 701 F.3d at 363. Such cases, however, are rare exceptions:

> "[T]hough venerable, the principle is rarely applied, because the result produced by the plain meaning canon must be truly absurd before this principle trumps it. Otherwise, clearly expressed legislative decisions would be subject to the policy predilections of judges. It is irrelevant that we may not have made the same policy decision had the matter been ours to decide if we cannot say that it is absurd, ridiculous, or ludicrous for Congress to have decided the matter in the way the plain meaning of the statutory language indicates it did."

*Id.* (internal quotation marks and citations omitted).

This, in my view, is not one of those cases. Here, the lack of a notice provision in the TCA, although an undesirable omission, creates no absurd result, at least as applied in this case and perhaps generally. And it certainly does not

51

require applicants to become any more familiar with the no doubt varying practices of enormous numbers of county and local bodies than is inherent in Congress' deliberate decision to preserve state and local control over cell tower placement except as specifically limited by the TCA.  *See* 47 U.S.C. § 332(c)(7)(A).  It requires only that applicants that file applications before particular local jurisdictions for land use and related permissions inform themselves about the laws and, where appropriate, any other relevant practices of the jurisdictions in which they file, which includes practices about how and when written decisions are rendered.  While I reiterate my agreement that a statutory notification requirement would be preferable to leaving the matter unaddressed in the TCA, I see nothing "absurd" about leaving it to applicants in specific jurisdictions to inform themselves.  That is especially so where the doctrine of equitable tolling is available to deal with any problems that may arise, as it is here.[12]

d. *T-Mobile South, LLC v. City of Roswell, Georgia*

---

[12] While by no means dispositive, I note that Fed. R. Civ. P. 77(d)(2) provides in substance that the time to appeal from appealable district court orders and judgments runs from the date of entry even where the clerk of court fails to give the notice of entry required by Fed. R. Civ. P. 77(d)(1).  Instances in which failure to file a timely notice of appeal is a product of a clerk's failure to give the required notice, among other circumstances, are, by virtue of language in Rule 77(d)(2), dealt with by applications under Fed. R. App. P. 4(a)(5) and (6), which are loosely similar to the doctrine of equitable tolling.

52

Finally, I am troubled also by the argument that *T-Mobile South, LLC v. City of Roswell, Georgia*, 135 S. Ct. 808 (2015), should be read to insert a notice requirement into the TCA.

In *T-Mobile South*, the City had held a public hearing to consider T-Mobile's application to construct a cellular communications tower. At the end of the hearing, the City voted to deny the application. It informed T-Mobile of its denial also in a letter two days later. The meeting minutes then were published 26 days later. The Supreme Court held that the statute of limitations in Section 332(c)(7)(B)(v) began to run as of the date of the City's letter to T-Mobile rather than as of the date that the meeting minutes were approved. It stated:

> "The City urges us to hold that the clock does not begin to run until after the reasons are given. We cannot so hold, however, without rewriting the statutory text. The [TCA] provides that a lawsuit may be filed by '[a]ny person adversely affected by any final action or failure to act . . . within 30 days after such action or failure to act.' 47 U.S.C. § 332(c)(7)(B)(v). The relevant 'final action' is the issuance of the *written notice* of denial, not the subsequent issuance of reasons explaining the denial. See *Bennett v. Spear,* 520 U.S. 154, 177-178, 117 S. Ct. 1154, 137 L.Ed.2d 281 (1997) (agency action is 'final' if it 'mark[s] the consummation of the agency's decisionmaking process' and determines 'rights or obligations' or triggers 'legal consequences' (internal quotation marks omitted))."

*T-Mobile South, LLC*, 133 S. Ct. at 817 n.4 (emphasis added).

*T-Mobile South* did not consider the question before us. T-Mobile had notice of the City's written decision by virtue of its receipt of the letter. The Court thus held only that the written decision denying the application, *i.e.*, the letter, rather than the subsequently approved minutes discussing the City's reasons for so

53

denying, triggered the statute of limitations in the statute.  The Court's mention of a "written notice of denial" therefore was *dicta*.  Indeed, the Court's refusal to engage in "rewriting the statutory text" supports construing the statute according to its plain meaning, which does not include a notice requirement.[13]

## III. CONCLUSION

For the foregoing reasons, I am persuaded that, although the County was not required to provide notice under Section 332(c)(7)(B)(v), the circumstances in this case warrant equitable tolling to September 2, 2014.  On that basis, I concur with the majority's decision to reverse and remand for further proceeding

---

[13] Nor do I find that the Court's citation to *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997), provides a basis for concluding that the statute of limitations began to run here on September 2, 2014.  The majority argues that the notion of a final action triggering "legal consequences" in *Bennett* supports its conclusion because the legal consequences of the Board's denial of Verizon's application were triggered only after the meeting minutes were approved. Op. at 24-25.  This argument, however, depends on the majority's construction of the Georgia Open Meetings Act, which, as discussed above, I do not join.